**John Ward TATE, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–75–387.**

Court of Criminal Appeals of Oklahoma.

Dec. 16, 1975.

Terry L. Meltzer, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

OPINION

BUSSEY, Judge:

Appellant, John Ward Tate, hereinafter referred to as defendant, was charged, tried and convicted in the District Court,

Tulsa County, Case No. CRF–74–2366, for the offense of Knowingly Concealing Stolen Property in violation of 21 O.S.1971, § 1713. The court fixed his punishment at four (4) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Jerry E. Resetz testified that he was employed as an operator in a Texaco cat extracting unit and lived in Tulsa, Oklahoma; that at 12:30 A.M. on August 30, 1974, he stopped at a club near 51st Street and South Union Avenue in Tulsa, taking his keys inside with him, but leaving his 1967 Ford pickup which had a shell camper on the back, unlocked in the parking lot. At 2:00 A.M. the club closed and he emerged to find that his pickup was gone. He walked across the street to a convenience grocery store and called the Tulsa police to report the theft of his pickup. Later the same morning he took the receipt for the purchase of the pickup as proof of title and went to the police station where he filled out a theft report. In court, Resetz recalled the serial number on the camper unit and its location on the camper. He related that on the day following the theft, as a result of information from the Creek County Sheriff's Office he went to Summer's Garage in Sapulpa, Oklahoma, where he reclaimed his pickup but discovered that the camper was no longer attached. Although he never saw his camper again, he subsequently learned that it had been recovered and he identified State's Exhibits 1–4 as being pictures of the shell camper. Resetz further testified that he had not given anyone permission to take his pickup or camper and he had never attempted to regain possession of his camper because he had received a full settlement from his insurance company.

On cross-examination Resetz testified that his insurance settlement had been finalized sometime in September of 1974; that his camper had been manufactured by the Sooner-Knapp Company and he did not know whether all Sooner-Knapp campers carried the same serial number.

James Barry Mahoney testified that he was eighteen years old and lived with his father whose home was located between Sapulpa and Sand Springs. He identified the defendant as an acquaintance of his. He related that in August of 1974, he had been living with his grandmother in Kiefer, Oklahoma, and during the early morning hours of August 30th, he and his mother's boyfriend, Chuck Strain, had hotwired a red 1967 Ford Ranger pickup and stole it from the parking lot of the Rock-Away Lounge located at 51st Street and South Union Avenue in Tulsa. Mahoney and Chuck Strain drove the stolen pickup to a bar where they met Mahoney's uncle, James Nigh, and transferred roofing materials which they had found in the stolen pickup to Nigh's pickup. During the remainder of the night the three men used the stolen pickup to transport plywood and tools which they had stolen from a construction site, to Mahoney's grandmother's house in Kiefer. When they had finished moving the stolen goods they took the camper off of the pickup and left the camper in Mahoney's grandmother's yard. Mahoney then took the stolen pickup out to old Lone Star Road in Sapulpa, where he abandoned it. Mahoney further testified that about a week after the theft of the Ford pickup, Chuck Strain stole a white Chevrolet pickup and put the stolen camper on the back of it and used this pickup for transportation. In September, Mahoney's grandmother got into an argument with his mother about the stolen goods accumulating in the yard and Chuck Strain took Mahoney's mother and sisters to the Viva Motel north of the Turner Turnpike in Tulsa. One day in early September, the defendant, whom Mahoney knew as a friend of Chuck Strain, came to Kiefer to find Strain and talk to him about some money Strain owed him. Mahoney told the defendant that Strain was staying at the Viva Motel and they went to the motel to find him. Maho-

ney testified that the defendant had a derringer and threatened Mahoney with it; ordering him to stay outside the motel room and sit on the sidewalk. The defendant got into an argument with Mahoney's mother and threatened to hurt her. The defendant left the motel but later returned and wanted to take the truck and the defendant told Strain that there was no way to stop him from doing so because he knew the truck was stolen and they could not report it to the police. Mahoney testified that the defendant forced him, at gun point, to drive the Chevrolet pickup with the camper on the back, to a house in Oakhurst, Oklahoma, and then the defendant drove him back to the Viva Motel. Mahoney further testified that he decided that he wanted out of this activity and reported the foregoing matters to Leroy Hughes of the Kiefer police. Officer Hughes took Mahoney to Roy Clugston of the Tulsa County Sheriff's Office and Clugston drove Mahoney out to the defendant's house where Mahoney identified the camper then on the back of the defendant's pickup, as the camper which Mahoney had helped steal on August 30, 1974. Mahoney was able to identify the camper by virtue of a dent on the right upper top and a broken handle on the right side. He also identified State's Exhibits 1–4 as picturing defendant's pickup with the stolen camper on it. Mahoney also related that on the night before he received his subpoena for the preliminary hearing, the defendant offered him $1,000.00 if he would refuse to testify and threatened to harm him if he decided to testify.

Roy Clugston testified that he was a deputy sheriff in the Tulsa County Sheriff's Office, assigned to the Intelligence Division; that on October 2, 1974, he went to the defendant's residence with James Mahoney and Mahoney pointed out a shell camper that was mounted on defendant's pickup truck and alleged that it was stolen property. Shortly after noon on October 2, 1974, Officer Clugston called Dave Gurthet who worked the stolen vehicle division at the Tulsa Police Department, and asked him if he had received a report of a red 1967 Ford Ranger pickup with a camper on it, as being stolen from the vicinity of 51st Street and Union. After checking his file, Officer Gurthet called back to advise that he did have a report of a stolen pickup matching the description of the one inquired about, and he passed along the serial number of the shell camper. Later on that same day Officer Clugston had an opportunity to return to the defendant's residence to assist Officer Gary James on a search warrant. At that time he inspected the camper on the pickup parked in the defendant's driveway and saw a serial number which matched the serial number which Officer Gurthet had communicated to him. Officer Clugston arrested the defendant, advised him of his rights, and called the Spears Wrecker Service from Prattsville to tow the pickup with the camper to their garage for storage. Officer Clugston concluded his testimony by identifying State's Exhibits 1–4 as photographs depicting defendant's pickup with shell camper attached, as they appeared on the day that he arrested the defendant.

David K. Gurthet testified that he had been employed as a Tulsa police officer for seven years and had been assigned to the Auto Theft Investigation Division for the past two years; that on October 2, 1974, he received a call from Officer Roy Clugston requesting a check on a stolen pickup and that a check of the records revealed that a red 1967 Ford pickup had been reported stolen from the vicinity of 51st and Union in Tulsa on August 30, 1974, and had been recovered the next day, but that the camper which had been on the back of the pickup at the time it was stolen was still missing. This information was communicated to Officer Clugston who called back the next day to report that the camper had been recovered and was in storage at Spears Garage in Prattsville. Officer Gurthet went to the garage where he supervised the photographing of the camper and the products of the photographing ses-

sion were State's Exhibits 1–4 which were offered into evidence at the conclusion of Officer Gurthet's testimony.

Glenda Smith testified that she was acquainted with the defendant and with James Mahoney; that she was with the defendant when he went out to James Mahoney's grandmother's house in Kiefer to find Chuck Strain. She testified that she was present later on that same day when the defendant and Chuck Strain conversed at the Viva Motel about $300.00 which Chuck Strain owed the defendant. She denied that the defendant had a gun with him or threatened Chuck Strain. She stated that James Mahoney suggested that the defendant be allowed to take the camper in payment of the debt that Chuck Strain owed and that James Mahoney voluntarily drove the pickup to a residence in Oakhurst where he found a tape measure and went outside to measure the camper to determine whether it would fit on the defendant's pickup while she and the defendant visited with friends in the house. On cross-examination, Miss Smith testified that she was the defendant's girlfriend and that he was married, but separated from his wife.

Charles Strain testified that he was a friend of the defendant; that in September of 1974, the defendant came by the motel where he was staying to collect $300.00 which Strain had borrowed from the defendant. He suggested that the defendant take the pickup which James Mahoney was driving as security until the loan could be repaid and James agreed. Strain denied that the defendant had a gun; denied that the defendant threatened anyone; and denied that the defendant stated that he was going to take the camper and Strain could not do anything about it because it was stolen. On Cross-examination Strain denied that he had argued with the defendant at the Viva Motel; denied that the defendant had ever pulled a gun on him; and denied that he knew anything about any stolen trucks or campers. He admitted that he still owed the defendant $300.00, but denied that the debt was going to be cancelled by his testimony.

Regina Deathrage testified that she lived in Oakhurst and had known the defendant about a year; that she remembered an evening in September of 1974 when James Mahoney, Glenda Smith and the defendant arrived at her home in a Mustang and a truck with a camper on it. She testified that she had known James Mahoney previously and on that night he asked her for a tape measure and when she found one for him he took it outside and measured the camper. She testified that she did not see a gun that evening nor did she hear the defendant or anyone else make any threats. On cross-examination, Mrs. Deathrage testified that she was a friend of the defendant, having met him a year earlier at a neighbor's house; that it was not unusual for the defendant to drop by at ten o'clock at night.

James Mahoney was resworn, but his rebuttal testimony was substantially the same as his testimony on direct examination.

■ The defendant's first assignment of error is that the trial court committed reversible error in overruling defendant's motion to suppress evidence prior to the preliminary hearing and prior to trial. The defendant points out that Officer Clugston came to his residence purportedly to execute a narcotics search warrant and that no mention was made of the stolen camper in the warrant. The defendant contends that the Fourth Amendment requires a warrant to particularly describe the things to be seized and seizure of a stolen camper under the authority of a narcotics warrant is a violation of the Fourth Amendment which requires that the court suppress the evidence wrongly obtained. The defendant argues that the camper and all testimony relating thereto should have been excluded as the fruits of an illegal search and seizure. We are of the opinion that the defendant has misconceived the scope of the Fourth Amendment. The Fourth Amendment to the

United States Constitution has been incorporated, word for word, in Article 2, Section 30 of the Oklahoma Constitution, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

The trial court in the instant case correctly ruled that evidence concerning the camper need not be excluded. The provisions of the Fourth Amendment do not apply to the facts in this case. Justice Stewart, writing for seven Justices, stated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967):

". . . What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . ."

Justice Harlan further elaborates in his concurring opinion:

". . . My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' . . ."

Whatever the defendant's subjective expectation of privacy with regard to the stolen camper may have been, the record indicates that he made no attempt to preserve that privacy; driving a stolen pickup openly with the stolen camper mounted on the back and then mounting the camper on his pickup which was parked in his driveway in full view of the street. The pickup was parked in the driveway at the time James Mahoney pointed it out to Officer Roy Clugston and it was there when Officer Clugston examined the back of the camper to determine the serial number. In light

of these facts we cannot say that society would be prepared to recognize any expectation of privacy which the defendant may have had as to the camper as a "reasonable" expectation of privacy, nor does a technical trespass onto the defendant's driveway bring this case within the scope of Fourth Amendment protection. In *Katz v. United States*, supra, it was specifically noted:

". . . [O]nce it is recognized that the Fourth Amendment protects people —and not simply 'areas'—against unreasonable searches and seizures it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure. . . ."

The fact that Officer Clugston checked the back of the camper to determine the serial number does not alter our conclusion as to the relevance of the Fourth Amendment to this case. Observation of a serial number imprinted in plain view on the right hand side of the outer edge of the door frame on the back of a camper does not constitute a search within the meaning of the Fourth Amendment. See *United States v. Polk*, 433 F.2d 644 (5th Cir., 1970). For these reasons we reject the defendant's contention that all evidence pertaining to the camper should have been excluded from the trial.

The defendant's second assignment of error is that the trial court committed reversible error in overruling defendant's motion to quash the information and dismiss the case. The defendant contends that the information charged that defendant concealed the stolen camper from the owner, Jerry Resetz, and that because Resetz had received a complete insurance settlement by the time the information was filed, the insurance company was the true owner and thus the allegation in the information could not be proven as charged. In support of this contention the defendant cites *Boggess v. State*, 29 Okl.Cr. 234, 233 P. 239 (1925), a case in which the information charged the crime of Receiving Stolen

Property. In that case the fact that the State could not prove that the defendant had received the stolen property from the individual whose name was contained in the information, cast serious doubt on whether he had actually received the stolen property at all. That is clearly not the situation in the present case. In *Walls v. State*, Okl.Cr., 491 P.2d 320 (1971), we examined the charge of Knowingly Concealing Stolen Property:

> ". . . Concerning that charge, the requirements of proof are: Defendant had knowledge that the property was stolen property; and, that he was in some manner concealing it from its rightful owner."

Regardless of whether Resetz, or the insurance company, held legal title to the camper at the time of the trial, it is apparent that the State has adequately met its burden of proving the essential elements of the crime of Knowingly Concealing Stolen Property.

■ The defendant's third assignment of error is that the trial court committed reversible error in overruling defendant's two motions for mistrial. The defendant contends, with reference to his first of two motions for mistrial, that members of the jury might have heard the trial judge discussing the nature of the present case in front of the courthouse elevators during the luncheon recess after the selection of the jury, but prior to the start of the trial, and that at this time the judge mentioned that the case was an A.F.C.F. case. The defendant cites no authority in support of his contention that his motion for mistrial should have been granted. The record reveals the following exchange concerning this incident:

> "THE COURT: Let me say this, for the record: The only person I can think of that I had any conversation with at all was Roehm West and his lady associate who is now engaged in the trial of a matter that I tried on a previous as-

signment here that resulted in a hung jury.

> "If you want to recess this in camera proceeding until Mr. West is available and take his proof I'll be happy to do that. I recognize the delicate nature of both the allegation and the extent to which you can inquire of a jury panel. This jury panel has been sworn but has not yet received any opening statements or evidence. I think now is the appropriate time to try to cure the problem.

> "I'll entertain an application to inquire of the jury panel if they overheard any conversation whatsoever between me and anyone else that in any way, shape, form or fashion related to this lawsuit. It's your own lawsuit.

> "MR. THOMPSON: Yes, Your Honor, that would have been a suggestion on behalf of the State, since there is a motion for a mistrial on behalf of the defendant, that the jury be brought back into open court, or however the Court would desire to conduct such an examination, for the sole purpose of inquiring as to whether or not they were at the area of the elevator at the time approximated by the defendant and if they overheard any conversations relative to this case on trial at this time made by Your Honor or any other purported third party.

> "MR. MELTZER: May I say this, Your Honor: I would be satisfied, I think, with the Court's statement that no such conversation took place and proceed with the trial of this cause without inquiring of the jury. I am afraid that if inquiry is made of the jury it's going to certainly not help our cause and perhaps hurt it.

> "THE COURT: Well, it's your motion. I recognize the delicate nature of the thing and that's the reason I stood personally ready, willing and able to have another judge come in and hear a motion to suppress to grant immunity and to take the witness stand and testify. I

specifically recall the matter. When Mr. West asked me the first time on the elevator I didn't answer him at all, you know, and I realized that was a very responsive way to deal with the problem and I waited until we were out of the elevator and told him I was trying, in Judge Green's court, a receiving stolen property case.

"Now, I have no quarrel whatsoever, you know, it's your motion. If you want the jury brought in and inquiry made of them, counselor, now is the time to do it before the opening statements are made.

"MR. MELTZER: Your Honor, I am not asking to pursue this any further.

"THE COURT: All right. The Motion will be—

"MR. THOMPSON: Your Honor, before this motion is ruled upon—I am in kind of a quandary here and if I may make a statement and address myself to the Court.

"THE COURT: All right.

"MR. THOMPSON: I would like to respond first of all to Mr. Meltzer's statement made a few moments ago to Your Honor that after his client has raised his hand to tell the truth and swore to tell the truth about the purported conversation and it's his motion for a mistrial that is [sic] hearing is being heard, that Mr. Meltzer tells the Court that he is satisfied that no such conversation as purportedly heard by the defendant took place. That intrigues me no end because if this is a Motion for a Mistrial I am going to inquire now, is he abandoning his motion in telling the Court that his client has purjured [sic] himself in the Court? I would like to get exactly where we are for this record here before we proceed further.

"THE COURT: Okay. I feel this way about it: There's only so much that can be—so much time that can be utilized in collateral matters. Now, counsel indicated—I didn't want to take this matter up until both counsel were present—but dur-

ing recess counsel indicated a willingness to abandon it but I feel that a record should be made and the matter should be preserved so there would not be a question later. Now, I have given each counsel an opportunity to come forward with additional witnesses if they desire. I understand the defendant has announced he has none. Do you have any witnesses you want to call, Mr. Thompson?

"MR. THOMPSON: Well, is he abandoning or withdrawing his motion for a mistrial?

"MR. MELTZER: Let me say this, maybe for the benefit of Mr. Thompson, I made the motion for a mistrial upon the insistence of the Court after I had passed along my client's allegations to the Judge. I probably would abandon it, in fact, I never would have brought it out in the open on the record had it not been for the Court's insistence but I don't think the Court, you know, at this point in time would permit me to abandon it.

"THE COURT: If there's no further proof that I am to receive in connection with the matter before the Court the Motion for a Mistrial is denied and the application for further voir dire of the jury is denied. Is there any further record before I bring the jury back in?

"MR. MELTZER: No, Your Honor." [Tr. 10–14]

We conclude, from a reading of this record, that the defendant was offered ample opportunity to pursue the questions of whether any conversation about the case had taken place between the judge and a third party; whether, if such conversation had taken place, it was overheard by any member of the jury; and whether, if such conversation occurred and was overheard, it prejudiced defendant's right to a fair trial. Presented with the opportunity to cure the problem complained of in the motion for mistrial, and having declined to do so, the defendant cannot now be heard to

complain that the trial court erred in its ruling on defendant's motion for mistrial.

 Defendant's second motion for a mistrial occurred when the Assistant District Attorney, in the course of redirect examination of James Mahoney, asked Mahoney if he had been subpoenaed to testify against Chuck Strain. At the time of the question Strain had not yet been called as a defense witness but was present outside the courtroom and was subsequently called to testify for the defendant. Defense counsel objected to the question on the grounds that it was an attempt to impeach a defense witness who had yet to be called. The judge sustained the objection and immediately admonished the jury to disregard the question. Defense counsel then moved for a mistrial and the Assistant District Attorney disclaimed any knowledge of Strain's upcoming appearance as defense witness. Defendant raised this issue on appeal without the benefit of any supporting authority. Considering the record in this case we conclude that the applicable principle is one that was enunciated by this Court in *Kitchens v. State*, Okl.Cr., 513 P. 2d 1300 (1973), wherein we stated:

> ". . . The court's admonition to the jury not to consider the remarks of counsel, or a witness, usually cures an error unless it is of such a nature after considering the evidence that the error appears to have determined the verdict. . . ."

The error in this case did not appear to have determined the verdict, and accordingly, we reject the defendant's contention that the trial court erred in not granting his second motion for mistrial.

 The defendant's fourth and final assignment of error is that the trial court committed reversible error in overruling defendant's demurrer to the evidence. Defendant argues that conflicting evidence was presented on the issue of whether he knew, or had reason to believe, that the camper in question was stolen property. We acknowledge that conflicting testimony on this issue appears in the record, but it is the opinion of this Court that the State presented sufficient competent evidence from which the jury could reasonably conclude that the defendant was guilty as charged. James Mahoney's version of events was in direct conflict with the defense witnesses' accounts of the same events. The jury chose to believe Mahoney. In the trial of a criminal case, questions of fact involving the guilt or innocence of the accused are always for the jury, and when, on appeal, the record discloses facts which would have been sufficient either to warrant a verdict of acquittal or to support a verdict of guilty, the findings of the jury will not be disturbed. In such cases only errors of law will be reviewed. See *Disheroon v. State*, Okl.Cr., 357 P.2d 235 (1960).

For all of the above and foregoing reasons, the judgment and sentence appealed from is accordingly,

*Affirmed.*

BRETT, P. J., and BLISS, J., concur.