THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RICHARD DINKINS, Appellant.

First Department, July 12, 1979

## APPEARANCES OF COUNSEL

*Edward S. Kornreich* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Carlos E. Mendez-Penate* of counsel *(Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

BLOOM, J.

The factual background of this case is fully set forth in the opinion of my brother FEIN. I agree that the cross-examination of defendant on his failure to register a complaint against Kurt, particularly in light of the emphasis given to the matter by the question put by the court, deprived defendant of his Fifth Amendment rights. It was, therefore, error so egregious as to mandate reversal. The cross-examination of his brother on the same subject, although improper, was error to a lesser degree and could have been cured by appropriate instruction (see concurring opn in *People v Burgos,* 69 AD2d 783). None was forthcoming.

However, I cannot agree that, given the facts here presented, the search of the car was improper. This was not a case involving the indiscriminate stop of a motor vehicle *(Delaware v Prouse,* 440 US 648; *People v Ingle,* 36 NY2d 413); nor did it entail the full-blown search which was the subject of *People v Bluitt* (33 NY2d 997); nor did it involve information allegedly anonymously transmitted, of which there was no record and which was susceptible of subsequent tailoring to conform to the objective circumstances found *(People v Horowitz,* 21 NY2d 55). Here, there was a 911 record. Although the printout was never introduced in evidence, it was present in court and used to refresh the recollection of the police officers. Here, the objective circumstances conformed to the information transmitted to the arresting officer by the 911 radio call. Hence, it makes little difference whether or not the car door was opened before defendant was questioned, for, in last analysis, the police officers would have had to proceed as they did.

Inasmuch as there existed a proper predicate for police action and the action taken was reasonable under the circumstances *(People v Williams,* 41 NY2d 65), the search was not improper.

Accordingly, the judgment should be reversed and the case remanded for a new trial.

FEIN, J. (concurring in part and dissenting in part). Defendant appeals from a judgment convicting him upon a jury verdict of criminal possession of a weapon in the third degree, and sentencing him as a predicate felon to a term of 2 to 4 years. He assigns as error the denial of his motion to suppress a shotgun found in his brother's car and claims that the search of the vehicle was improper, since there was lacking probable cause that he had committed or was committing a crime. He further contends that the court erred in permitting the prosecutor to cross-examine both defendant and his brother with respect to their failure to give an exculpatory account of the events to the police at the time of arrest. Defendant maintains that the cross-examination infringed upon his constitutional right to remain silent and improperly suggested to the jury that his brother had a duty to make a report of the events to law enforcement officials.

Defendant was arrested by police officers Quinn and McAndrews on August 29, 1976 at approximately 11:15 P.M. The officers had received a radio run that there was "a man with a shotgun" in a blue Buick, parked at 114th Street and Eighth Avenue, bearing license plate number 407YPW. The information concededly emanated from an anonymous 911 telephone call. When the officers arrived on the scene, they "observed the defendant exiting the vehicle", which conformed to the description in the radio run, except for the last letter in the license plate, a "U" instead of a "W", a discrepancy which both parties agree does not affect the propriety of the ensuing search.

The facts leading to the search are undisputed. Officer Quinn, after shouting to defendant to "freeze", approached the parked car. Without attempting to observe the interior of the vehicle by looking through the windows, Officer Quinn opened the door and discovered the shotgun between the driver's seat and the door. According to Quinn, the defendant was approximately 15 to 20 feet from the vehicle at the time. While Quinn went to the vehicle, McAndrews proceeded toward defendant, who had been walking along the street away from the blue Buick and had stopped at the command, "freeze". Both officers had their guns drawn. McAndrews "grabbed" defendant from behind and frisked him and found no weapon. However, Quinn had already searched the vehicle and found

the shotgun. Defendant was thereupon placed under arrest by McAndrews.

On the trial, defendant testified he had taken the shotgun away from one Kurt, following a confrontation, moments before the police arrived. Defendant had been on a painting job with his brother and another man in a nearby building. All three had driven to the area in his brother's car. After parking the car, they left the vehicle to go to a nearby store. Kurt appeared. Defendant owed him about $7,000 because of a drug problem which defendant had between 1965 and 1969. During the course of an angry conversation between defendant and Kurt, another man, carrying a shotgun, crossed the street and gave the weapon to Kurt. Kurt fired at defendant, but the gun misfired, enabling defendant to take the shotgun away from Kurt. Defendant walked back to the car with the weapon. When he realized he did not have the keys, he got out of the vehicle to get them from his brother, at which point the search and arrest occurred.

Defendant's brother, James, testified that he ran from the scene when he saw the man cross the street carrying the shotgun, partially concealed under his coat. When he returned he saw defendant holding the gun. Defendant said Kurt tried to kill him. James followed Kurt to inquire as to what had happened. The police arrived. James attempted to tell the police what had transpired, but was told not to "worry about it, he's under arrest, come down to the precinct."

## I. THE SEARCH OF THE AUTOMOBILE

The suppression Justice erred in denying the motion to suppress the shotgun. There was an insufficient basis for the warrantless search of the vehicle. The search was not shown to be necessary to protect the lives or to ensure the safety of the officers. There were no exigent circumstances to justify such a search, at least without first stopping defendant for appropriate inquiry concerning the information imparted to the officers in the radio run. Nor may support for the propriety of the search be found in the anonymous 911 telephone call, advising the police that there was a man "with a shotgun" in a certain blue Buick, parked at a certain location. Although an anonymous tip that a man with a gun was at a designated location has been held sufficient to justify police officers in stopping to inquire of a suspect who met the description, and frisking him if necessary (*People v McLaurin,*

43 NY2d 902), such a tip is an insufficient predicate for a warrantless search of the vehicle.

Contrary to the finding of the suppression court, there was no proof in any way associating defendant's emergence from the vehicle with the approach of the officers. There is no evidence to support the court's finding that "the defendant, upon seeing the police car, hurriedly exited from his vehicle and walked briskly away from the police down the middle of the street". Both officers testified that their vehicle was some distance behind the blue Buick when they saw defendant emerge from it. There was no testimony to establish or to found an inference that defendant got out of the vehicle because he saw the police approaching, as found by the court in denying the motion to suppress.

The undisputed testimony of both officers was that Quinn searched the vehicle by opening the driver's door to look inside before McAndrews, the recorder in the police vehicle, had reached defendant to inquire of or frisk him. It does not appear that either officer had concluded, at the time the search was conducted, that defendant did not or could not have had the weapon on his person. The record is silent as to any purported justification for the officers first proceeding to search the vehicle before stopping and detaining defendant for appropriate inquiry. There is no claim here that the officers were in any fear as to their own safety. It is not without significance that defendant was walking away from the vehicle and was approximately 15 to 20 feet from the car when he was directed to "freeze" and that he stopped and was seized and frisked after the car search. Even assuming that McLaurin (supra) authorized the seizure and frisk of defendant, it is inappropriate to speculate as to whether the police could have properly searched the vehicle after the fruitless search of defendant's person and such response as he might have made, in response to police inquiry.

The rationale underlying McLaurin (supra) and similar cases which uphold the authority of the police to stop and frisk, is to ensure the safety of the police officer and others. That consideration turns on detaining and inquiring and even frisking the individual, not a search of an empty vehicle. The gun, contained within the unoccupied vehicle, posed no threat sans someone to fire it. The anonymous call named only one person in the vehicle. There was no testimony that there were other people in the car or in the vicinity who could be

expected to enter the car to retrieve the weapon for possible use against the officers.

Nor is it dispositive that the search conducted here was of a motor vehicle. Clearly, "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view." *(Cardwell v Lewis,* 417 US 583, 590.) Nevertheless, there is no authority to exclude motor vehicles from the protective cloak of the Fourth Amendment and "the right to privacy that is the touchstone of our inquiry." *(Cardwell v Lewis, supra,* p 591.) The Supreme Court in *Cardwell* expressly found the interior of an automobile to have Fourth Amendment protection against unreasonable governmental intrusion. The "search" in that case, conducted in connection with a murder investigation, was limited to an unobtrusive examination of the exterior of a vehicle left in a public parking lot, consisting of a search of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle. The Supreme Court was careful to note *(supra,* pp 588-589): "The evidence with which we are concerned is not the product of a 'search' that implicates traditional considerations of the owner's privacy interest. It consisted of paint scrapings from the *exterior* and an observation of the tread of a tire on an inoperative wheel. The issue, therefore, is whether the examination of an automobile's exterior upon probable cause invades a right to privacy which the interposition of a warrant requirement is meant to protect." (Emphasis in original.)

*People v Bluitt* (33 NY2d 997) although involving a somewhat more extensive search than that here, is instructive. In *Bluitt,* a search of a vehicle resulted in the discovery of a gun under the front seat. The police there had acted on the advice of an unidentified person who pointed to a vehicle in motion and told the officers: "That man in the car have a gun." The officers, after following the car, stopped it and ordered defendant out of the vehicle. After a frisk did not disclose a weapon, one of the officers reached under the driver's seat and retrieved a revolver, which had not been visible beforehand. The Court of Appeals unanimously affirmed without opinion the order of this court, which affirmed an order granting defendant's motion to suppress. The facts in *Bluitt* are

stronger than those presented in this case, since in *Bluitt,* the police acted in reliance upon an on-the-scene tip, albeit, from an unidentified informant. Also, defendant's vehicle in *Bluitt* was in motion, unlike the parked Buick in this case. Moreover, in *Bluitt,* the officers stopped defendant first, to inquire and to frisk him before any search of the vehicle. Nevertheless, the courts in *Bluitt* found no probable cause and concluded that the search was not reasonably necessary to insure the protection of the officers. A fortiori in our case, involving a parked, unoccupied vehicle, where the officers did not approach defendant to question or frisk him before conducting the search, and where the record is barren of proof to indicate that Officer Quinn had concluded that defendant did not or could not have the weapon on his person, the search cannot pass constitutional muster.

The Court of Appeals recently observed in *People v West* (44 NY2d 656, 657): "To establish probable cause based upon an informant's tip, whether for issuance of a search warrant or for a warrantless arrest and search conducted in exigent circumstances, it must be shown that the informant is credible or reliable, and also that he had a sufficient basis for concluding that the subject of the tip is engaged in illegal activities. (See *Aguilar v Texas,* 378 US 108, 114; *People v Wirchansky,* 41 NY2d 130, 131; *People v Hanlon,* 36 NY2d 549, 556; *People v Castro,* 29 NY2d 324, 326.)" The court there reversed the conviction and dismissed the indictment, finding significant the failure of the informant to disclose the basis for the information imparted by him to the police. The court further found the observations of the arresting officers insufficient to bolster the information conveyed by the informant, observing in this connection *(supra,* p 657): "In fact, the informant never revealed how he came to acquire this information. Since the informant failed to disclose the basis for his acquisition of this information, the *Aguilar* test was not satisfied. *(People v Wirchansky,* 41 NY2d, at p 133, *supra.)* We cannot presume from the informant's statement that his information was gleaned from personal observation. (See *People v Hendricks,* 25 NY2d 129, 136.)" To the same effect is *People v Elwell* (66 AD2d 172).

Similarly, in our case, there is lacking any proof as to the manner by which the informant acquired the information which was imparted to the police. There is no showing that the person who placed the 911 telephone call revealed how he

or she acquired knowledge of the presence of the shotgun in the blue Buick. As was held in *People v West (supra),* we cannot presume that such information was obtained by personal observation. Nor may the observations of Officers Quinn and McAndrews be found sufficient to bolster the information conveyed in the radio run.

It is fundamental that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment —subject only to a few specifically established and well delineated exceptions." *(Katz v United States,* 389 US 347, 357; *Coolidge v New Hampshire,* 403 US 443, 454-455.) No such exception here exists. *People v Clark* (45 NY2d 432) makes the point.

There the defendant was literally caught red-handed in the course of committing a crime, to wit: a burglary of a supermarket. When apprehended, Clark had a lock in one hand, a lock pick in another, and a bag of burglary tools nearby. When the police officers frisked him, they found keys to a rented car which they had earlier seen parked in a discrete part of the parking lot. The search of the car followed the arrest, for which there was probable cause. Here, unlike *Clark,* defendant was not caught during the commission of a crime. Nor did the officers observe a crime in progress. The situation which confronted the police here is far different from that faced in *Clark.* No exigent circumstances exist here as to warrant the unauthorized search of the vehicle before the police had detained defendant for interrogation. It does not appear that defendant, who had stopped pursuant to Quinn's command, presented any real danger or threat to the safety of the two officers so as to warrant the search of the vehicle. Nor was there as yet any evidence of the commission of a crime to justify a belief that the search of the vehicle would "produce the fruits, instrumentalities, contraband or evidence" of the crime. *(People v Lewis,* 26 NY2d 547, 552.)

II. THE CROSS-EXAMINATION OF THE DEFENDANT AND HIS BROTHER AS TO THEIR FAILURE TO OFFER AN EXCULPATORY ACCOUNT OF THE EVENTS TO THE POLICE AT THE TIME OF ARREST

Were I not voting to reverse the conviction and dismiss the indictment because of the erroneous ruling on the motion to suppress, I would nevertheless reverse and remand for a new

trial because of the improper cross-examination of defendant and his brother, which impinged upon defendant's right to a fair trial.

I find error in the cross-examination of defendant concerning his failure to offer an exculpatory account of the events to the police at the time of arrest. Clearly, defendant had the right to remain silent. He had no obligation, as the prosecutor intimated, to offer an exculpatory account to the police. (See *Doyle v Ohio,* 426 US 610; *People v Conyers,* 65 AD2d 437.) I find no basis for concluding that defendant must have made a statement to police at the scene, based solely upon his testimony that he told the officers to look on the ground for the shotgun shell (the shell which had been ejected by Kurt when the gun misfired). Such proof does not warrant any speculative inference that defendant must have made a further statement to the police at the time of his arrest.

It is inappropriate to assume that since defendant made the statement about retrieving the shell, he necessarily made other statements as to what transpired. We are bound by the record, which does not indicate any statement having been made by defendant at the time of arrest. There is nothing in the record to support a finding that defendant said anything, other than the statement with respect to the shotgun shell. Officer Quinn testified that the reference to the shell was made at the precinct not at the scene. That statement, wherever made, cannot support the cross-examination as to why defendant did not file a complaint against Kurt, nor report to the police that Kurt had tried to shoot him. The error was compounded when the Trial Justice joined in the inquiry, compelling a response by defendant to the question posed by the court: "Why didn't you make a complaint?" By this inquiry, the court bolstered and highlighted for the jury, the prejudicial cross-examination by the prosecutor. The cross-examination as to his failure to report the confrontation with Kurt to the police impinged upon his constitutional right to remain silent (see *People v Conyers, supra).* We observed in *Conyers* in this connection *(supra,* p 441): "cross-examination and summation by the prosecution highlighted for the jury the silence of defendant at the time of his arrest and his failure to offer to the police the exculpatory statement testified to at trial, despite the well-settled law that a defendant in custody has no obligation to speak. This is not a case where a defendant because of his office or job may have a duty to

speak. (See *People v Rothschild,* 35 NY2d 355.)" (See, also, *People v Smoot,* 59 AD2d 898, 899.)

Equally improper was the prosecutor's cross-examination of defendant's brother, which did more than merely suggest that the brother's trial testimony was a recent fabrication. It improperly implied a duty by the brother to report what had transpired to the police and/or to the District Attorney. However, no authority appears which obligates a person in such position to disclose such information to law enforcement officials (see *People v Maschi,* 65 AD2d 405; *People v Milano,* 59 AD2d 852; *People v Clark,* 64 AD2d 669; *People v Smoot, supra; People v Hamlin,* 58 AD2d 631). Here, as in *People v Maschi (supra),* the prosecutor posited before the jury a duty of disclosure which had been breached by the witness. The error in this case is indeed more glaring than that in *Maschi,* since here the court joined in the improper inquiry, thereby bolstering the implication by the prosecutor that the witness had failed to fulfill a duty to disclose to law enforcement officials what had occurred. This is apparent from the following extracts from the cross-examination of defendant's brother, James Dinkins:

"Q. And you saw that. Your brother told you that Kurt tried to kill him, was that correct, sir?

"A. Yes.

"Q. Did you ever report that to the police?

"A. At the time when it happened I had tried to talk to the police and like tell them, you know, like they have the wrong person under arrest because when I first * * *

"Q. I didn't ask you that, sir.

"A. I'm trying to explain it to you the way I know how.

"THE COURT: Let him finish the answer.

"A. When I tried to talk to the police to explain what had happened, you know, like they told me like he's under arrest and that's when I had asked them about, what is he under arrest for. I said, this here doesn't belong to him. I was trying to explain to them what was really happening and they told me don't worry about it, he's under arrest, come down to the precinct.

"Q. Did you ever report what Kurt did to any police officer, make out an official report?

"A. No, sir.

"Q. You didn't think that was important. Someone tried to kill your brother.

"MR. GOLDBERG: Objection.

"THE COURT: Overruled. Do you understand the question?

"THE WITNESS: Yes, I understand the question. Can you repeat it again, please.

"Q. Didn't you think it was important that someone tried to kill your brother?

"A. Yes, I thought it was important but like I didn't, I don't know if you talking about reporting it or something. I tried to report it and explain the situation the way it was.

"Q. You said that the police told you to go down to the precinct and make an official report. Did you ever do that?

"A. No. Excuse me.

"MR. GOLDBERG: I object to that last question.

"THE COURT: Sustained. That was not his testimony. Rephrase your question.

"THE COURT: When you object just object don't state your reasons unless I invite them. Go to your next question.

"Q. You stated that when you had a conversation with the police at the time your brother was arrested this took place at 114th and 8th Avenue?

"A. Yes.

"Q. And the police told you that your brother was under arrest at that time and that was that. Correct?

"A. Yes.

"Q. I am now asking you did you after that time ever make a report about this incident that when Kurt tried to shoot your brother?

"A. Official document, no.

"Q. Did you ever make an unofficial report?

"A. Unofficial?

"MR. GOLDBERG: Objection.

"THE COURT: Overruled.

"A. Unofficial, no.

"Q. So, I am now asking you, did you think it was important that Kurt tried to kill your brother or did you think it was nothing?

"A. I don't understand the question.

"THE COURT: Why didn't you make a report about what had happened to your brother?

"THE WITNESS: Okay, I understand the question now.

"A. All them formalities, police procedure or going to court, I don't know too much about. * * * I don't know too much about going down to the precinct or making a formal complaint about Kurt. I didn't know about these things. I didn't think at the time to do something of that nature.

"Q. Do you know when someone has a crime committed against one that person can call up the police. Do you know about that?

"A. Being that the police was on the scene at the time I thought, you know, they would take care of the matter being that they were * * * hay, don't worry about it, he's under arrest or he's going to the precinct. I thought that, you know * * *

"Q. You thought the police would take care of it and that's why you never bothered reporting it?

"A. Right.

"Q. Where was Kurt at the time you returned and saw your brother holding the shotgun. Where was Kurt at that time?

"A. Further into the block.

"Q. And did there come a time when you were standing with Kurt after your brother had the shotgun, speaking with him?

"A. Yes.

"Q. Were you mad at him at that time?

"A. Yes.

"Q. Did you drag him over to the police at that time and say, this is the guy?

"A. No.

"Q. But your brother had already told you that Kurt tried to shoot him, kill him, I think your words were?

"A. Right.

"Q. You didn't try to get Kurt, the person who tried to kill your brother, over to the police, is that what you are saying?

"A. I did not.

"Q. You didn't think that was important either, did you?

"A. (No oral response.) Let's start here, at the time my mind was concerned about other things at the time my brother was

being put under the gun by numerous amounts of policemen and that was my main concern at the time. I completely blocked out Kurt.

"Q. But at that time you know you knew Kurt was the cause of your brother's problems, right?

"A. This here is another entire problem altogether.

"Q. And numerous policemen, there were two police officers, weren't there?

"THE COURT: Your questioning is taking on an argumentative flavour."

The cross-examination of defendant's brother denied defendant his right to a fair trial. The prosecutor's attempt to discredit the witness was clearly designed "to implant in the jurors' minds the proposition that the witness was unworthy of belief because he had failed to promptly divulge the subject matter of his * * * testimony to the appropriate law enforcement authorities." (People v Milano, 59 AD2d 852, 853, supra.) Here it appears that defendant's brother did attempt to offer an exculpatory account at the scene of the arrest. He was rebuked by the officers, who told him to go to the precinct if he wished to make a report, since his brother had been placed under arrest. It was plain enough that the police at the scene ignored his story. What duty he had to go to the precinct to make "an official report" does not appear. Nevertheless, the prosecutor continued with a relentless attack upon the witness, challenging his credibility for failing to persist in efforts to report the matter to the authorities, despite the fact that, under the law, there was no duty upon the witness to do so. The resulting prejudice was compounded when the court joined in the attack with the inquiry: "Why didn't you make a report about what had happened to your brother?" Both the cross-examination and, to a certain extent, the summation by the prosecutor, were improperly premised upon the existence of such a duty and its breach by the witness. Moreover, it ignored James' testimony as to his efforts to explain to the police. The prosecutor's summation records the following: "These are brothers. James Dinkins is told that Kurt tried to kill his brother and what does he do, he goes and has this little talk with him, conversation with Kurt. I mean, he's trying to tell you that Kurt took this weapon, pointed it at his brother, pulled the trigger but he's going to have a conversation with Kurt about this. Nothing really terrible about that. No reason to ever report it to the police, or, you know, Kurt,

you know, it is only his brother. Do you believe that that's what happened? I ask you. And he tells you when the police arrived and he's still talking with Kurt, the man who just tried to kill his brother, the man who just tried to kill his brother with a gun, that we know is operable with ammunition, that we know is operable, no he doesn't tell the police that. Just, you know, lets Kurt wander off fine."

Defendant was denied his fundamental right to a fair trial. The cross-examination of defendant unnecessarily impinged upon his right to remain silent. The cross-examination of his brother improperly suggested to the jury that James Dinkins had violated a nonexistent duty to divulge to law enforcement officials the exculpatory account related by him at trial. Therefore, were I not voting to reverse and to grant the motion to suppress and dismiss the indictment because of the unlawful search of the vehicle, I would nevertheless vote to reverse and remand for a new trial, based upon the substantial prejudice resulting from the improper cross-examination of defendant and his brother.

Accordingly, the judgment, Supreme Court, New York County (SILBOWITZ, J. [mot to dismiss indictment under CPL 30.30]; AARONS, J. [mot to suppress]; ROTHWAX, J. [trial and sentence]), rendered July 27, 1977, convicting defendant upon a jury verdict of criminal possession of a weapon in the third degree, should be reversed, on the law, the motion to suppress granted, and the indictment dismissed.

SILVERMAN, J. (dissenting). I would affirm the conviction.

### I. SEARCH OF THE AUTOMOBILE

I think the search of the automobile was justified.

In the present case the police received a 911 telephone call describing the car, giving its license number and its location and stating that there was a man with a shotgun in it. The police went there and found the described car in that place and saw the defendant get out of it. Such a call, even though anonymous, at least when corroborated by the accuracy of the descriptive facts (car, license number, location) is a sufficient predicate for police action. (Cf. *People v Correa*, 47 NY2d 807, revg 56 AD2d 934 on dissenting opn of HOPKINS, J.)

In *People v Clark* (45 NY2d 432, 438-439), the Court of Appeals said with respect to a search of an automobile:

"Upon the facts presented we must determine if the police

had a reasonable belief that the vehicle was, in some way, associated with the crime and that a search of the vehicle would 'produce the fruits, instrumentalities, contraband or evidence' of the crime *(People v Lewis,* 26 NY2d 547, 552) * * *

"One last word on the search of the automobile. We agree with the appellant that whereas warrantless searches of automobiles have been sustained in circumstances that would not justify a similar search of a building *(Cady v Dombrowsky,* 413 US 433) there is no blanket 'automobile exception' to the constitutional protections against unlawful searches and seizures *(Preston v United States,* 376 US 364; *People v Spinelli,* 35 NY2d 77).* On the other hand, to attempt a judicial restraint on the search which was conducted in this case would be to ignore the exigencies of the moment—the danger and difficulty incidental to guarding the vehicle in a desolate parking lot at that hour on New Year's Eve; the possibility of accomplices gaining access to the car; and, of course, the mobility of the vehicle. To say that the police should be discouraged from conducting this vehicle search would require a perverse application of the exclusionary rule."

Applying these standards here, there can be no doubt that the police had a reasonable belief that the vehicle was associated with the crime and that a search of the vehicle would produce the contraband. The 911 telephone call said the shotgun was in the car. Again we have here the exigencies of the moment; the difficulty incident to guarding the vehicle in a high crime area; the possibility of accomplices gaining access to the car; and the mobility of the car.

In my view, it is immaterial whether the police looked into the car first or talked to the defendant first. The finding of the shotgun in the car was not the result of any questioning of the defendant. Whatever he said, the police could hardly leave without looking to see whether the gun was in the car.

The issue of the reasonableness of the search was not before the jury. But I note that on summation, the defendant's attorney said, "the police officers acted as logical police officers would under the circumstances."

## II. THE CROSS-EXAMINATION OF DEFENDANT AND HIS BROTHER ABOUT THE FAILURE TO COMPLAIN

Examination of the record indicates that defendant con-

tended at the trial that he had been attacked with the shotgun by one Kurt, in the course of which Kurt had caused a misfired shell to be ejected from the shotgun and dropped to the ground, and that thus he, defendant, had only temporary possession of the shotgun incident to the lawful purpose of protecting himself, *and that defendant had indicated this to the police at the scene.* Having thus injected this issue, including the question of what the defendant told the police, defendant is precluded from urging on appeal that the prosecution could not bring out the incompleteness of what defendant told the police.

In *Doyle v Ohio* (426 US 610, 619-620, n 11), the Supreme Court addressed the precise issue of the impropriety of questioning a defendant about postarrest silence and made this caveat: "It goes almost without saying that the fact of postarrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." (See, also, *People v Savage,* 67 AD2d 562.) That is this case.

Thus the course of examination on this issue was as follows:

On cross-examination of the police officer, defendant's attorney asked the police officer whether at the time of his arrest defendant had asked him to look for a shell. This is the first reference to any statement by defendant. Thereafter defendant's brother testified and on direct examination told of the incident as he had been told it by defendant. On cross-examination he told of his complaint to the police. Thereafter defendant testified and he too on direct examination told of the incident, told of the ejection of the shell and said that he told the police to look for a shell. In this context, the defendant's contention that he told the police to look for a shell was relevant only as an indication that defendant made a statement to the police supporting his contention. (In summation, defendant's attorney confirmed that this was his strategy. He said: "The defendant must have complained to the police at the time on the scene when he asked them to look for the shell on the ground * * * The shell that popped out of the gun when Kurt tried to shoot my client * * * When the defendant was arrested that's when he said, please, there is a

shell on the street, please get that shell. That's what he must have said." Similar statements were made about defendant's brother.) It was then open to the District Attorney on cross-examination to show that even by defendant's own statement, he had not told the police of the Kurt incident.

This is not a case of a defendant who chooses to exercise his constitutional right to remain silent at the time of arrest or when arrest is imminent. Rather it is a case of a defendant who claims to have made an exculpatory statement at that time and thus the prosecution had the right to explore fully the scope of the claimed exculpatory statement and its failure to give the obvious salient fact now claimed, i.e., that an attempt had been made by a third person on defendant's life.

No objection was made by defendant to his examination by the District Attorney or the related questions by the court. This failure to object is consistent with the defendant's trial attorney's tactics and inconsistent with his appellate counsel's present contention of the impropriety of the examination. Indeed, one of the important reasons for our exercising cautiously our power to notice claimed errors in the absence of objection at the trial is that such absence of objection is frequently rather strong evidence that what happened at the trial was in line with appellant's trial strategy, and that the contention on appeal is an afterthought inconsistent with that strategy, a strategy which is then transmuted into a claim of error on appeal.

As to the brother, the propriety of the examination is even clearer. The brother not being a defendant, there is no self incrimination objection to questioning him about his silence and his failure to inform the police. The objection now appears to be that that questioning implies a duty to inform the police, and that there is some absolute prohibition against such questioning. But we need not find a duty to inform the police to justify this cross-examination. It is enough if it would have been normal and natural for the witness to have informed the police if the event had transpired as he said, so that failure to inform the police would properly bear on the probability of his testimony. Here we have a man who is told that an attempt had just been made to kill his brother with a shotgun. The police arrive; and it would obviously have been the normal thing to do to tell them that somebody had just tried to kill his brother. Hence, cross-examination as to whether he did tell the police this fact was proper. He may

have given a satisfactory explanation of his conduct, as indeed I think he did if his testimony is believed. But that does not make the cross-examination improper.

FEIN and LANE, JJ., concur in part and dissent in part in an opinion by FEIN, J.; BIRNS, J. P., and SILVERMAN, J., dissent in an opinion by SILVERMAN, J.

Judgment, Supreme Court, New York County, rendered on July 27, 1977, reversed, on the law, and the case remanded for a new trial.