Wachtleb, J.
In September, 1971, the F.B.I. in New York City received information about the hijacking of two trucks. According to this information specifically describing the color and markings of the two stolen vehicles, one of the vehicles had been leased by Hertz Corporation to P. B. Trucking Company and bore the marking “ Roxanne Swim Suits ”; the other was a Metropolis Trucking Company vehicle. On March 21, 1972 F.B.I. Agent Garber was advised by a confidential informant that both of these stolen vehicles were located in the rear of the premises of defendant’s business, the Al Spinelli Company. The next day, Garber went to the Rockland Lake Golf Course, a public course. There, he stood about a foot or two from a fence enclosing defendant’s property and separating the golf course from defendant’s property.
*79 Aided by binoculars, Garber observed: “ a green straight truck and [sic] had the Eoxanne Swim Suits on it, and on the front of the truck — on the front of the box of the truck P.B. and some other words were on the truck. The other truck was a silver * * * straight truck * * * and with the binoculars I was able to see Metropolis Trucking Corporation ”. After these observations-were made, Garber ascertained from P. B. Trucking Company and Metropolis Trucking Corporation that no other vehicles matching the descriptions of those observed at defendant’s premises had been hijacked subsequent to September, 1971.
Garber notified the local Clarkstown police of his information and observations of the two trucks. On August 18, 1972 the Clarkstown police, acting on Garber’s information, went to the golf course, from which they observed the two vehicles on defendant’s premises. On the afternoon of August 21, 1972, Garber and the Clarkstown police who had observed the vehicles on August 18 accompanied a State Police Investigator Cunningham to defendant’s premises. There, outside of the front door of the building on defendant’s premises, Cunningham placed defendant under arrest pursuant to an arrest warrant for unlawful use of credit cards, a misdemeanor charge unrelated to the indictment in the present case. Cunningham had been notified a week or two earlier about the F.B.I. information as to the two stolen vehicles on defendant’s premises and Cunningham had, on receipt of this information, confirmed through police files that these vehicles were still listed as stolen.
After defendant’s arrest, without a search warrant, Cunningham, Garber, and the Clarkstown police “ went to the rear of the premises to check out the two vehicles in question.” There, they saw the two vehicles which had been observed throughout the prior five-month period and proceeded to open the hood of one of the trucks and inspect the vehicle identification number. Several hours later, the police seized the vehicles and removed them to the local police station. The next day, an arrest warrant charging defendant with unlawful possession of the two trucks was issued.
Defendant was indicted only for unlawful possession of one of the trucks — the P. B. Trucking Company vehicle bearing *80 the name “ Roxanne ”. Defendant moved to suppress the search and seizure of that vehicle. The County Court ordered the suppression of that vehicle. The Appellate Division (Gtjlotta, J., dissenting) reversed the County Court order.
It is well settled that a businessman’s private commercial property is entitled to Fourth Amendment protections (see See v. City of Seattle, 387 U. S. 541, 543). In the case at bar, the law enforcement officials knew that the trucks were in the rear of defendant’s business establishment for four months. There were no license plates on the trucks, and given the length of time which elapsed before the officials finally took action, it is clear there was no fear of the evidence being suddenly spirited away. In fact, respondent makes no such allegation. Under these circumstances, a search warrant should have been obtained before the truck in question was seized. (See Coolidge v. New Hampshire, 403 U. S. 443; Chimel v. California, 395 U. S. 752, 764, n. 9.)
Respondent initially asserts that no warrant was needed because the truck was seen in plain view. A person who leaves an article in plain view has no legitimate expectation of privacy with respect to that item (see Ker v. California, 374 U. S. 23, 43). But generally the mere fact that a law enforcement official has detected an item in “ plain view ” does not means he can conduct an unlimited search and seizure without a warrant. The Coolidge court spelled out two very rational caveats on warrantless plain view searches and seizures.
First, the court noted that plain view alone is never enough to justify a warrantless search and seizure (Coolidge, supra, p. 468). And it makes no difference if the article seized is 11 mere evidence ”, contraband or evidence of the crime or fruits of the crime. (Coolidge, p. 468; see, also, Warden v. Hayden, 387 U. S. 294.) The second requirement is that the object must have 'come into plain view inadvertently (Coolidge, supra, p. 466). If the ‘‘ discovery is anticipated” (p. 470) as in the case at bar, the warrantless search ¡must fall. This requirement prevents law enforcement officials from circumventing constitutional requirements by (waiting to effect a legitimate arrest when the defendant is near the incriminating evidence.
*81 In both the Coolidge case (Coolidge, supra, pp. 474, 464, n. 22) and the case at har, the law enforcement officials had the requisite probable cause to obtain a search warrant. The viewing of the trucks could not be said to be inadvertent. It should be noted, however, that upon the trial, the officers who viewed the trucks can testify as to what they saw from the golf course. The mere viewing of an object in the way in which it was done in the case at bar is not embraced by the concept of search or seizure.*
The fact that defendant was not arrested for possessing the stolen truck until the next day is not a relevant factor since, as defendant concedes, the officers had probable cause to arrest him for that offense before the trucks were seized. But the arrest of defendant in front of the house did not justify a search behind the premises (see Chimel v. California, 395 U. S. 752, supra). And although there was a prior justification which enabled the officers to enter on the property (i.e., the credit card arrest), the truck did not then inadvertently come into plain view. In fact, the F.B.I. agent and State police officer who viewed the truck from the golf course were present when the arrest was made. They then proceeded immediately to the rear of the premises beyond the area of the arrest to where they knew the trucks were located. The arrest gave them no more justification to seize the trucks than if the officers had proceeded immediately to the rear of the house without effecting an arrest.
The crux then is that there was ample time for the law enforcement officials to secure a warrant in order to make this significant intrusion onto defendant’s premises. One must be careful to distinguish between constraints on police conduct which limit effective police enforcement and those constraints which merely make effective police enforcement more burdensome. In the case at bar there was absolutely no justification — either *82 relating to exigent circumstances or the nature of the search or seizure effected — for not obtaining a search warrant. The mere fact that it would be burdensome to obtain a warrant, standing alone, is never justification for not obtaining a search warrant (McDonald v. United States, 335 U. S. 451, 455; Coolidge, supra, pp. 479, 481).
We do a great disservice to the highly professional and efficient law enforcement officials of this State to determine that they cannot perform their job effectively without impinging upon a vei;y important constitutional right. Duties of law enforcement officials are extremely demanding in a free society. But that is as it should be. A policeman’s job is easy only in a police state.
The record in this case indicates excellent police work. The failure to secure a warrant was by no means a sinister attempt on the part of the police officers to deprive an individual of his constitutional rights. But in an age of advancing technology the courts’ vigilance in protecting a citizen’s right to privacy becomes more necessary than ever before. The goal is not to protect criminals but to protect the standards of decency in our society. The privacy of an innocent citizen, of necessity, must be judged by the same standards as those applied to citizens who later are found to be guilty. As Justice Gtjlotta stated in his dissent:1 ‘ the validation of this search amounts to justifying a basically illegal procedure on the basis of the successful results in this particular case and thus encourages further incursions by the police on the rights of citizens in other cases where perhaps the results will not justify the means.”
The order of the Appellate Division should be reversed and the order of the County Court suppressing the evidence should be reinstated.
Chief Judge Bbbitel and Judges Jasen, Gabbielli, Jones and Babin concur; Judge Stevens taking no part.
Order reversed, etc.

 It is significant that the trucks could be viewed with the naked eye, and, later, aided only by a pair of binoculars. We are aware that with the increasingly sophisticated modern equipment available to law enforcement agencies, it is becoming increasingly possible to view objects that would not be observed by a person not in possession of such sophisticated equipment. In this case we need not reach the question of when such a teenologieally aided viewing of an object in and of itself rises to the level of a constitutionally cognizable search.