[No. 45931. En Banc. December 31, 1980.]

THE STATE OF WASHINGTON, *Appellant,* v. JERRY GEORGE SIMPSON, *Respondent.*

*Curtis M. Janhunen, Prosecuting Attorney,* and *Michael G. Spencer, Deputy,* for appellant.

*John A. Strait,* for respondent.

WILLIAMS, J.—This case comes before us on certification from the Court of Appeals. The State has appealed from a Superior Court order granting respondent's motion to suppress evidence. We affirm.

Patrolmen Larry McCluskey and Steve Loyer of the Aberdeen Police Department went to the residence of respondent Jerry Simpson and waited there to arrest him on a warrant charging first degree forgery. After a time, respondent drove up in a Chevrolet pickup truck with big tires, mag wheels, and two beer decals in the back window. He parked in front of the residence, got out, and locked the truck. The officers then approached him, and after respondent identified himself, they placed him under arrest.

Before returning to the station, McCluskey noted the number on the rear license plate and radioed for a registration check on the truck. He testified he felt that the "vehicle did not match" respondent who was, in McCluskey's opinion, somewhat older than one likely to own such a truck.

The officers transported respondent to jail, where his personal possessions including the truck key were inventoried and placed in a property box. At the station, McCluskey received the following return on his registration request: "Not a current record, license has been cancelled, see a different license number." A driver's check on the respondent revealed that his driver's license had been suspended. After conferring with his captain, McCluskey concluded that either the license plate had expired or been stolen, or the vehicle was stolen. He did not discuss the matter with respondent.

The two officers then returned to impound the truck because it was improperly licensed. At that point Loyer noticed for the first time that the front license plate was missing. McCluskey testified that he next unlocked the truck with the key he had taken from the police property box and checked the vehicle identification number (VIN) "to ascertain who the vehicle was registered to. I didn't know the vehicle was stolen." Upon learning the VIN did not match the VIN assigned to the license plate, he ran another check and found the truck was stolen. Following a search of the truck's interior, McCluskey impounded the vehicle, testifying later that he was compelled to retain the invalid license plate and the vehicle "until we could find out what actually occurred."

Following all these events, the officers advised respondent of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). He waived his rights, was then questioned about the truck, and ultimately admitted he had purchased it with knowledge it was stolen.

At a pretrial hearing, respondent moved to suppress both the evidence produced by the seizure of the VIN and his incriminating statements to the police. The trial court held that the inspection of the VIN violated the Fourth Amendment and suppressed the evidence and the statements as the fruits of an unconstitutional search. The State appealed.

## I

The State first contends that respondent Simpson may not raise any Fourth Amendment objections to the search in this case because an individual has no Fourth Amendment privacy rights in a stolen vehicle.[1] Respondent argues that he is entitled to raise his Fourth Amendment claims under the "automatic standing" doctrine of *Jones v. United States,* 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725, 78 A.L.R.2d 233 (1960).

As a general rule, the "'rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.'" *Rakas v. Illinois,* 439 U.S. 128, 138, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *United States v. Salvucci,* 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980). Thus, a defendant generally may challenge a search or seizure only if he or she has a personal Fourth Amendment privacy interest in the area searched or the property seized. *Sal-*

---

[1]The State's precise claim was that respondent lacked "standing" to raise Fourth Amendment objections to the search. Subsequent to the suppression hearing, the United States Supreme Court held in *Rakas v. Illinois,* 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978), that the question of a defendant's ability to raise a Fourth Amendment claim will no longer be considered in terms of "standing". According to *Rakas,* this question should be framed instead in terms of the defendant's "legitimate expectation of privacy" and consequent Fourth Amendment rights in the area searched or property seized. *Rakas,* at 140, 143; *see also* *United States v. Salvucci,* 448 U.S. 83, 87 n.4, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980); *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 96 S. Ct. 2577 (1979). As will be made clear in this opinion, however, the concept of standing still retains some validity under the Washington Constitution.

*vucci,* at 86–87; *Rakas,* at 140. The defendant must personally claim a "'justifiable,' . . . 'reasonable,' or . . . 'legitimate expectation of privacy' that has been invaded by governmental action." *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979); *Rakas,* at 143.

Until recently, a special exception to these general Fourth Amendment rules applied in cases in which a criminal defendant had been charged with an offense that has possession of property as an element. In such cases, the defendant could claim "automatic standing" to challenge the search or seizure of contraband or stolen goods even though he or she could not technically have a privacy interest in such property. *Jones,* at 263–65; *Rakas,* at 135 n.4. This automatic standing principle has also been recognized as a constitutional rule under our state constitution. *State v. Michaels,* 60 Wn.2d 638, 646–47, 374 P.2d 989 (1962); Const. art. 1, § 7.

The United States Supreme Court has recently overruled *Jones* and thereby abolished the Fourth Amendment automatic standing rule. *United States v. Salvucci, supra.* In order to explain our disposition of this case, it is necessary to explore briefly the original grounds for the automatic standing rule and the Supreme Court's reasons for deciding it should no longer operate.

As explained in *Jones,* the automatic standing rule was originally created to effectuate two separate policy judgments: (1) The doctrine was said to ensure that the State will not assume contradictory positions by arguing in the suppression hearing that the defendant did not have possession of the property and therefore lacked any Fourth Amendment privacy interests, and then arguing at trial that the defendant was guilty of unlawful possession of the property. The court concluded that "[i]t is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government." *Jones,* at 263–64; *see also Brown v. United States,* 411 U.S. 223, 229, 36 L.

Ed. 2d 208, 93 S. Ct. 1565 (1973). (2) The principle was established to ensure in addition that a defendant claiming possession in order to acquire standing in the suppression hearing would not have this evidence used against him at trial on the issue of possession. *Jones,* at 261–64.

This second policy basis for the rule was partially eliminated when the court in *Simmons v. United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), held that a defendant's testimony in a suppression hearing cannot be admitted against him or her at trial. Moreover, the recent decision in *Salvucci* has likewise abandoned the first policy basis, the "vice of prosecutorial self–contradiction", *Brown,* at 229. The majority opinion in *Salvucci* states:

> To conclude that a prosecutor engaged in self–contradiction in *Jones,* the Court necessarily relied on the unexamined assumption that a defendant's possession of a seized good sufficient to establish criminal culpability was also sufficient to establish Fourth Amendment "standing." This assumption, however, even if correct at the time, is no longer so.
>
> The person in legal possession of a good seized during an illegal search has not necessarily been subject to a Fourth Amendment deprivation.

(Footnotes omitted.) *Salvucci,* at 90–91. Citing *Rakas* and *Rawlings v. Kentucky,* 448 U.S. 98, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980), the court explained that possession of a seized good was not a substitute for a "factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." *Salvucci,* at 92. Thus, the court concluded, henceforth the question under the Fourth Amendment is not whether a defendant has a possessory interest in seized items, but whether he has an expectation of privacy in the area searched. If not, mere possession of the item will not confer a right under the Fourth Amendment to contest the legality of a search and seizure. *Salvucci,* at 92–93.

The foregoing summary establishes without dispute that the automatic standing doctrine no longer retains any

vitality under the United States Constitution. But our inquiry is not complete until we ascertain whether the state constitutional rule of automatic standing has also been abridged.

■ It is by now well established that state courts have the power to interpret their state constitutional provisions as more protective of individual rights than the parallel provisions of the United States Constitution. *See Oregon v. Hass,* 420 U.S. 714, 719, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975); *Alderman v. United States,* 394 U.S. 165, 175, 22 L. Ed. 2d 176, 89 S. Ct. 961 (1969); Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489 (1977); Note, *Rights of Criminal Defendants: The Emerging Independence of State Courts,* 1979 Hamline L. Rev. 83. Such independent interpretation of state constitutional provisions is particularly appropriate when the language of the state provision differs from the federal, and the legislative history of the state constitution reveals that this difference was intended by the framers. *See, e.g., People v. Anderson,* 6 Cal. 3d 628, 493 P.2d 880, 100 Cal. Rptr. 152 (1972); *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978); *see generally* Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution,* 29 Stan. L. Rev. 297 (1977).

The language of the search and seizure provision of our state constitution, Const. art. 1, § 7, differs significantly from the fourth amendment to the United States Constitution. The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Const. art. 1, § 7, on the other hand, states:

> No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

Historical evidence reveals that the framers of the Washington Constitution intended to establish a search and seizure provision that varied from the federal provision. The Constitutional Convention was presented with a proposed state provision identical to the Fourth Amendment, and rejected it in favor of the present Const. art. 1, § 7. *See The Journal of the Washington State Constitutional Convention: 1889,* 497 (B. Rosenow ed. 1962).

The intentional difference between the state and federal provisions naturally does not permit a reading of the state provision that is more restrictive of defendants' rights than federal law. *See Burgett v. Texas,* 389 U.S. 109, 114, 19 L. Ed. 2d 319, 88 S. Ct. 258 (1967). However, there is precedent for interpreting this particular language in a state constitution as conferring upon a defendant a higher degree of protection than is provided by the federal constitution. Const. art. 1, § 7 differs from the Fourth Amendment in that it clearly recognizes an individual's right to privacy with no express limitations.

In *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978), and *State v. Glass,* 583 P.2d 872 (Alaska 1978), the state supreme courts held that similar privacy provisions of their state constitutions are clear authority for finding that state law provides a higher degree of protection in search and seizure cases than does the Fourth Amendment. As the Alaska Supreme Court pointed out, there is no comparable express guaranty of privacy in the United States Constitution. *Glass,* at 875.

Moreover, we have interpreted our own constitution as affording greater protection than the Fourth Amendment in the area of custodial arrests for minor traffic offenses. *State v. Hehman,* 90 Wn.2d 45, 49, 578 P.2d 527 (1978). We declined there to follow the rules of *United States v. Robinson,* 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973), and *Gustafson v. Florida,* 414 U.S. 260, 38 L. Ed. 2d 456, 94 S. Ct. 488 (1973), holding that the United States Constitution established minimum rights and that we were

entitled to find the Washington Constitution extended greater protection.

Accordingly, there is ample basis for interpreting Const. art. 1, § 7 as more protective than the federal constitution. In *State v. Michaels,* 60 Wn.2d 638, 644–47, 374 P.2d 989 (1962), we held that the state constitution confers automatic standing on defendants who have been charged with an offense that has possession as an element. It remains only to be determined whether there are still sufficient grounds for our retention of the automatic standing rule.

As noted above, the United States Supreme Court has decided that the prosecution no longer is forced to assume contradictory positions in the suppression hearing and at trial, where the inquiry is not whether one has a possessory interest in a seized item, but rather whether the defendant has a legitimate expectation of privacy. *United States v. Salvucci,* 448 U.S. 83, 93, 65 L. Ed. 2d 619, 629, 100 S. Ct. 2547 (1980). In addition, *Simmons,* which held that evidence adduced in a suppression hearing to support a claim of violation of Fourth Amendment rights was not admissible as evidence of guilt at trial, partially solved the self-incrimination dilemma which was discussed in *Jones.*

In *Salvucci,* the defendants argued that the self–incrimination dilemma is not entirely resolved by *Simmons,* since the prosecutor may still be permitted to use a defendant's suppression hearing testimony to impeach him or her at trial. *Salvucci,* at 93. The court declined to address this issue, although it hinted broadly in a footnote that such testimony is admissible as impeachment evidence. *Salvucci,* at 93 n.8.[2]

A realistic appraisal of this argument leads us to the conclusion that *Simmons,* as interpreted by the court in

---

[2]In another recent case, the United States Supreme Court held that illegally obtained evidence may be used to impeach a defendant's statements "made in response to proper cross–examination reasonably suggested by the defendant's direct examination . . ." *United States v. Havens,* 446 U.S. 620, 627, 64 L. Ed. 2d 559, 566, 100 S. Ct. 1912 (1980).

*Salvucci,* does not provide sufficient protection against the self–incrimination dilemma. In Washington, prior statements made by a defendant are admissible at trial for purposes of impeachment. ER 613; *see, e.g., State v. Peele,* 10 Wn. App. 58, 67, 516 P.2d 788 (1973). Thus, without automatic standing, a defendant will ordinarily be deterred from asserting a possessory interest in illegally seized evidence because of the risk that statements made at the suppression hearing will later be used to incriminate him albeit under the guise of impeachment. For a defendant, the only solution to this dilemma is to relinquish his constitutional right to testify in his own defense.[3] *See Salvucci,* at 96 (Marshall, J., dissenting).

In our view, our constitution's privacy clause, with its specific affirmation of the privacy interests of all citizens, encompasses the right to assert a violation of privacy as a result of impermissible police conduct at least in cases where, as here, a defendant is charged with possession of the very item which was seized. Any other conclusion allows the invasion of a constitutionally protected interest to be insulated from judicial scrutiny by a technical rule of "standing". The inability to assert such an interest threatens all of Washington's citizens, since no other means of deterring illegal searches and seizures is readily available. *See generally* Note, *The Independent Application of State Constitutional Provisions to Questions of Criminal Procedure,* 62 Marq. L. Rev. 596 (1979); Kuhns, *The Concept of*

---

[3]The damage done to a defendant's case by allowing the state to impeach his testimony by use of suppression hearing testimony has been well expressed by the Pennsylvania Supreme Court in a case in which it declined on independent state grounds to follow the rule of *Harris v. New York,* 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971):

"Harris–type use of constitutionally infirm confessions forces upon an accused a grisly Hobson's choice. Either an accused must forgo his right to testify, or he must risk the sure and devastating prejudice occasioned by the prosecution's use of the impermissibly obtained confession at the critical rebuttal stage."

*Commonwealth v. Triplett,* 462 Pa. 244, 249, 341 A.2d 62 (1975), quoting from *Commonwealth v. Woods,* 455 Pa. 1, 7, 312 A.2d 357 (1973).

*Personal Aggrievement in Fourth Amendment Standing Cases,* 65 Iowa L. Rev. 493, 521–24 (1980); Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 409–39 (1974).

Under these circumstances, we discern both a continuing policy basis and firm state constitutional grounds for adherence to the automatic standing rule. The rule is already established under our state constitution and has served our state well for 17 years, *Michaels,* at 646–47, and we decline to abandon it for the reasons set forth above.

The question then becomes whether the respondent in this case can claim the protection of the automatic standing rule. As we explained in *Michaels,* at pages 646–47, a defendant has "automatic standing" to challenge a search or seizure if: (1) the offense with which he is charged involves possession as an "essential" element of the offense; and (2) the defendant was in possession of the contraband at the time of the contested search or seizure. *See also Brown v. United States,* 411 U.S. 223, 228–29, 36 L. Ed. 2d 208, 93 S. Ct. 1565 (1973); *Jones v. United States,* 362 U.S. 257, 263–65, 4 L. Ed. 2d 697, 80 S. Ct. 725, 78 A.L.R.2d 233 (1960); *see generally* 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.3, at 589–95 (1978). The respondent in this case was charged with first degree possession of stolen property; a requisite element of this offense is possession of the stolen goods. RCW 9A.56-.140(1) and .150(1). Thus, respondent was charged with an offense which has possession as an "essential" element. *See, e.g., State v. Van Ackeren,* 194 Neb. 650, 235 N.W.2d 210 (1975). Respondent also had possession of the property at the time of the search. When the search took place, the locked truck was located directly outside respondent's house where he had left it, and the key to the truck was being held for the respondent by the police. Thus, respondent had the requisite relationship to the seized property at the time when the contested search took place. *See generally* 3 W. LaFave, at 590; *see Brown,* at 228–29.

■ Respondent is, therefore, entitled to the full protection of the automatic standing doctrine. He has the right to invoke all the privacy interests that an individual properly in possession of the truck could assert. *See Rakas v. Illinois,* 439 U.S. 128, 135 n.4, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978).

## II

The State next claims that, even if respondent has automatic standing and can accordingly assert all the privacy interests of an individual properly in possession of a car, he nevertheless does not have a legitimate expectation of privacy in a VIN because even a person properly in possession of a truck would not have a legitimate expectation of privacy in a VIN. The State also argues that even if respondent is found to have a legitimate expectation of privacy in a VIN, the warrantless search of the VIN was reasonable and conformed to Fourth Amendment requirements.

The conclusion that respondent has automatic standing to challenge the search in this case does not preclude the State from claiming that he nevertheless lacks a legitimate expectation of privacy in the VIN. A defendant who has acquired automatic standing in effect stands in the shoes of an individual properly in possession of the property that was searched or seized. In this case, therefore, a person rightfully in possession of the truck would have a "'legitimate' expectation of privacy" in it. *Rakas,* at 143 n.12. However, such a person may not have a legitimate expectation of privacy in all parts of his protected property at all times. *See, e.g., Katz v. United States,* 389 U.S. 347, 351, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Thus, it is necessary to determine whether a person with a legitimate expectation of privacy in a motor vehicle would also have a legitimate expectation of privacy in that vehicle's VIN.

The VIN is a serial number which is assigned to automobiles and trucks for the purpose of identifying and routinely keeping track of the ownership of vehicles. The VIN may be placed by the vehicle's manufacturer in any one of several possible places on or in the vehicle: on the dashboard where it can be read by anyone standing outside the vehicle and looking through the windshield; on the bottom of the vehicle where it can be viewed by crawling underneath the vehicle; inside the hood where it can only be seen by opening the hood; or on the side of the doorpost where it can only be examined by opening the vehicle door. 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.5, at 357–58 (1978).

 As courts in other jurisdictions have recognized, the degree of privacy interest which an individual may have in his car or truck VIN is determined by three separate factors: (1) the extent of the privacy interest in a motor vehicle, which is subject to special Fourth Amendment rules as a result of its mobility; (2) the degree of privacy interest in the part of the vehicle to which the VIN has been affixed; and (3) the amount of privacy interest in the serial number itself. *See, e.g., United States v. Powers,* 439 F.2d 373, 375–76 (4th Cir.), *cert. denied,* 402 U.S. 1011, 29 L. Ed. 2d 434, 91 S. Ct. 2198 (1971).

Because of the inherent mobility of a motor vehicle, it is impracticable in many situations to obtain a warrant prior to a vehicle search. In situations of this type, police officers may conduct a warrantless search as long as they have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Arkansas v. Sanders,* 442 U.S. 753, 760–61, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979); *Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925). Accordingly, an individual would have a lessened privacy interest in his VIN in those situations in which the mobility of the vehicle renders it impracticable to obtain a warrant prior to searching the VIN. *See, e.g., United States v. Zemke,* 457 F.2d 110, 113 (7th Cir.), *cert. denied,* 406 U.S. 947, 32 L. Ed. 2d 335, 92 S. Ct. 2051

(1972); *State v. Colon,* 6 Conn. Cir. Ct. 722, 725, 316 A.2d 797 (1973); *Commonwealth v. Navarro,* 2 Mass. App. 214, 218–22, 310 N.E.2d 372 (1974). Of course, the consideration of mobility would not diminish the individual's privacy interest in those situations in which the motor vehicle is not readily moveable and the officer has a practicable opportunity to obtain a warrant before searching the vehicle. *See, e.g., State v. Ercolano,* 79 N.J. 25, 397 A.2d 1062 (1979); *see generally* 2 W. LaFave, § 7.2(b), at 519–25.

An individual has only a limited privacy interest in the VIN serial number, which is recorded and used for public identification purposes, and thus is "quasi–public information". *See, e.g., United States v. Brown,* 535 F.2d 424, 428 n.1 (8th Cir. 1976); *Powers,* at 375–76; *Shirley v. Commonwealth,* 218 Va. 49, 56–57, 235 S.E.2d 432 (1977).

The degree of privacy interest in the part of the vehicle where the VIN is located is a separate question from the extent of privacy interest in the serial number itself. The difference between these matters is illustrated by the principles governing searches of the serial identification numbers of other types of commercial products. A serial identification number on a product such as a television set is also "quasi–public information" in that it is recorded and used for identification purposes. Yet, in *State v. Murray,* 84 Wn.2d 527, 527 P.2d 1303 (1974), we concluded that an individual had a full privacy interest in the serial number which was stamped on the bottom of his television set and totally concealed from the view of the police officers in his apartment. Although the number itself was quasi–public in that it was recorded elsewhere and used for identification purposes, the bottom of the television set was a private and fully protected area. The difference between a privacy interest in a number and a privacy interest in a place where the number is written down is also apparent in the context of telephone company recordings of the phone numbers dialed from a private telephone. The United States Supreme Court held in *Smith v. Maryland,* 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979), that an individual

does not have a legitimate or reasonable expectation of privacy in the numbers dialed from his telephone. The court was careful to point out, however, that the numbers were recorded by a device installed in the telephone company office and it was not necessary to invade the "'constitutionally protected area'" of the person's home in order to record the numbers. *Smith,* at 741.

The location of the VIN can have a significant effect on an individual's privacy interest. When VIN's are stamped on the exterior parts of a vehicle or on the part of the dashboard that is plainly visible through the windshield, the numbers are fully exposed to the public. As the United States Supreme Court explained in *Katz,* at 351, the knowing exposure of private property to the public is not a subject of Fourth Amendment protection. Thus, in approving searches of VIN's, courts have emphasized that the VIN was in plain view on an exterior part of the vehicle or on the dashboard. *E.g., Brown,* at 426 (dashboard); *Zemke,* at 112–13 (exterior of motorcycle); *Colon,* at 725 (dashboard); *Tate v. State,* 544 P.2d 531, 536 (Okla. Crim. App. 1975) (exterior of camper); *see generally* 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.5(d), at 357–58 (1978). A different question is presented when the VIN is hidden from public view on some interior portion of the vehicle, and it is necessary to enter the vehicle in order to view it. *See, e.g., People v. Brooks,* 405 Mich. 225, 244, 274 N.W.2d 430 (1979) (holding that there was no reasonable expectation of privacy in a VIN on a visible exterior portion of a vehicle, and recognizing that a different Fourth Amendment question would have been presented if the VIN had been on an interior portion of the vehicle); 1 W. LaFave, at 358–61.

In cases involving searches of VIN's, therefore, the degree of privacy interest in the VIN must be determined by considering the mobility of the vehicle, the degree of privacy expectation in the area of the vehicle in which the VIN is located, and the limited privacy interest in the serial number itself. The cases typically involve a VIN which is in

open view on the dashboard or exterior of a readily moveable vehicle. *See, e.g., Brown, Zemke,* and *Colon.*[4] In these cases, the courts have concluded that the limited privacy interest in the VIN, the limited privacy expectation in the dashboard or exterior of the vehicle, and the limited privacy right in a moveable vehicle all combine to drastically reduce the individual's privacy interest in his VIN. These courts have, accordingly, tested the propriety of the search of the VIN with the standard established in *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), for searches which infringe upon limited privacy interests: police officer awareness of "specific and articulable facts" which would lead a reasonable person of ordinary caution to believe that the action taken was appropriate. *See, e.g., Colon,* at 725–26; *see also, e.g., United States v. Powers,* 439 F.2d 373, 374–76 (4th Cir.), *cert. denied,* 402 U.S. 1011, 29 L. Ed. 2d 434, 91 S. Ct. 2198 (1971).

Apparently, no court has ever resolved the precise question which is presented in this case: the degree of expectation of privacy in a VIN which is located on the interior of a closed, locked door of a lawfully parked, immobile vehicle. *See United States v. Baker,* 452 F.2d 21, 23 (5th Cir. 1971), *cert. denied,* 405 U.S. 974, 31 L. Ed. 2d 248, 92 S. Ct. 1195 (1972) (explaining that "[t]he cases have . . . explicitly avoided passing on the Fourth Amendment status of a vehicle identification number check of a locked vehicle", and then resolving that issue with respect to a vehicle that

---

[4]In several VIN cases, there were special factors which had the effect of further reducing the individual's expectation of privacy and/or bringing the case within one of the exceptions to the Fourth Amendment warrant requirement. *See United States v. Dadurian,* 450 F.2d 22, 24–25 (1st Cir. 1971), *cert. denied,* 405 U.S. 1044, 31 L. Ed. 2d 586, 92 S. Ct. 1329 (1972) (search of VIN was a legitimate inspection in the course of civil attachment of the automobile); *United States v. Polk,* 433 F.2d 644, 646–47 (5th Cir. 1970) (consent by lawful owner of garage in which automobile located); *United States v. Johnson,* 413 F.2d 1396, 1399 (5th Cir. 1969), *aff'd en banc,* 431 F.2d 441 (5th Cir. 1970) (consent); *United States v. Graham,* 391 F.2d 439, 442–43 (6th Cir.), *cert. denied,* 393 U.S. 941, 21 L. Ed. 2d 278, 89 S. Ct. 307 (1968) (inventory search incident to lawful impoundment). As Part III of this opinion explains, none of these factors were present in this case.

was readily moveable); *Cotton v. United States,* 371 F.2d 385, 394 (9th Cir. 1967) (expressly reserving the question of "whether [an officer] can break into a car without a warrant if the car be locked").

We conclude that respondent Simpson, standing in the shoes of an individual with a legitimate expectation of privacy in the locked truck, had a fully protected legitimate expectation of privacy in the VIN under the Fourth Amendment and Const. art. 1, § 7. A "'legitimate expectation of privacy'" is a privacy expectation which is both subjectively held and "objectively . . . 'justifiable' under the circumstances." *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979). As earlier discussed, respondent could have only a limited expectation of privacy in the VIN serial number itself, since this number was "quasi–public" information. However, the VIN serial number was on a plate which was hidden from public view and which could only be examined by entering into the private interior of the truck. Moreover, respondent had not only closed, but also locked the door of the vehicle.[5] The very act of "lock[ing] the doors . . . against intruders" manifests a subjective expectation of privacy which is objectively justifiable. *United States v. Chadwick,* 433 U.S. 1, 11, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977); *United States v. Presler,*

---

[5]Even though the police officers in this case had a key to the truck door, we must treat the truck as a locked vehicle since it was not constitutionally permissible for the officers to use the key to open the truck door. The police officers were in possession of the key because they were holding it in the police property box for safekeeping while respondent was in custody on the forgery charge. When police arrest an individual, they may be entitled to use personal effects that he was carrying at the time of arrest, as evidence of the offense for which he was arrested. *See United States v. Edwards,* 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234 (1974). The police may not, however, use a personal effect such as a key in subsequent investigations of totally unrelated offenses. *See, e.g., People v. Vogel,* 58 Ill. App. 3d 910, 374 N.E.2d 1152 (1978). Thus, the police in this case committed an unconstitutional seizure when they took a key, which was being held for a forgery suspect, and used it to investigate the separate offense of unlawful possession of a stolen vehicle. Since individuals must not benefit from their unconstitutional actions, we must assume for purposes of analyzing this case that the police did not have the key to the truck door.

610 F.2d 1206, 1213–14 (4th Cir. 1979).[6] Finally, the vehicle in this case was lawfully parked on a public street and was not readily moveable since the driver and door key were in police custody. Thus, although respondent did not have a legitimate expectation of privacy in the VIN itself, he had a legitimate expectation that other people would not break open the locked door of the truck in order to view that VIN.

Since there was a fully protected legitimate expectation of privacy in this case, the search of the VIN had to be justified by either a search warrant or one of the exceptions to the Fourth Amendment warrant requirement. *Arkansas v. Sanders*, 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979). The search in this case was conducted without a warrant and therefore it is necessary to determine whether the case comes within any of the exceptions to the warrant requirement.

### III

A warrantless search is "per se unreasonable" and can be justified only if it falls within one of the "'jealously and carefully drawn'" exceptions to the Fourth Amendment warrant requirement. *Sanders*, at 759–60; *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980). The burden is upon the State to show that a warrantless search or seizure falls within one of these exceptions. *See Sanders*, at 760; *Houser*, at 149.

The State argues that the warrantless search of the VIN in this case comes within the warrant requirement exception for an inventory search incident to a lawful impoundment of a vehicle. In order to justify a warrantless

---

[6]Of course, this is not to say that an individual is incapable of having a fully protected legitimate expectation of privacy in the interior of an unlocked object. *See, e.g., Sanders*, at 762 n.9 (defendant had fully protected privacy interest in unlocked suitcase, just as would an individual possessing a locked suitcase). The fact that a person took the special precaution of locking an object is simply one of several factors which can evidence a subjective justifiable expectation of privacy in the interior of the object.

search on this ground, the State must demonstrate that the impoundment was lawful, and that the inventory search was proper and not a mere pretext for an investigatory search. *See South Dakota v. Opperman*, 428 U.S. 364, 375–76, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976); *see generally* 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.4(a) (1978).

█ A motor vehicle may be lawfully impounded in certain specific circumstances: (1) as evidence of a crime, if the officer has probable cause to believe that it was stolen or used in the commission of a felony, *Houser,* at 149–50; (2) as part of the police "community caretaking function," if the removal of the vehicle is necessary (in that it is abandoned, or impedes traffic, or poses a threat to public safety and convenience, or is itself threatened by vandalism or theft of its contents), *and* neither the defendant nor his spouse or friends are available to move the vehicle, *Houser,* at 150–52; *State v. Hardman,* 17 Wn. App. 910, 567 P.2d 238 (1977), *review denied,* 89 Wn.2d 1020 (1978); *State v. Bales,* 15 Wn. App. 834, 552 P.2d 688 (1976), *review denied,* 89 Wn.2d 1003 (1977); and (3) as part of the police function of enforcing traffic regulations, if the driver has committed one of the traffic offenses for which the legislature has specifically authorized impoundment. *See State v. Singleton,* 9 Wn. App. 327, 332–33, 511 P.2d 1396 (1973); 2 W. LaFave, § 7.4(a).

The impoundment in this case cannot be justified on the basis of probable cause to believe that the vehicle was stolen. The officers knew only that the rear license plate was no longer valid and that the front plate was missing. Although respondent certainly was in violation of traffic regulations, there was not probable cause to believe that he stole the vehicle rather than simply failing to attend to his licensing responsibilities. The officer's conjecture that respondent did not "fit" the vehicle was no more than an "inarticulate hunch," and therefore cannot serve as the

basis for a warrantless seizure. *Cf. Delaware v. Prouse,* 440 U.S. 648, 661, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979).[7]

The impoundment also cannot be justified under the community caretaking function. The truck was lawfully parked in front of respondent's house and did not impede traffic or threaten public safety or convenience. The vehicle was safe from vandalism and theft of its contents: it was locked, and the record reveals that there were neighbors who were willing to watch over the truck while respondent was in police custody.

---

[7]The case law reflects some ambiguity in the requirements for impoundment of an immobile vehicle on the basis of probable cause to believe that the vehicle is evidence of a crime. When the vehicle is readily moveable, the inherent mobility of the vehicle permits a warrantless seizure whenever the police have probable cause to believe that the vehicle is stolen or has been used in the commission of a felony. *See State v. Houser,* 95 Wn.2d 143, 622 P.2d 1218 (1980). Several courts have concluded, however, that the special consideration of vehicle mobility does not justify this warrant requirement exception in cases in which the vehicle is immobile. *See, e.g., People v. Spinelli,* 35 N.Y.2d 77, 315 N.E.2d 792, 358 N.Y.S.2d 743 (1974); *State v. Ercolano,* 79 N.J. 25, 397 A.2d 1062 (1979). Under this analysis, the existence of probable cause to believe that the vehicle is evidence of a crime can justify the warrantless seizure of an immobile vehicle only if the case comes within the special warrant requirement exception for "property in plain view . . . [when] there is probable cause to associate the property with criminal activity." *Payton v. New York,* 445 U.S. 573, 587, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). Thus, there would have to be both probable cause to believe that the immobile vehicle is evidence of a crime, and satisfaction of the prerequisites for application of the plain view exception. *See, e.g., Spinelli,* at 80–81; *see generally* 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.3(a), at 547–49 (1978).

If the plain view doctrine is a part of the test for impoundment of immobile vehicles on the basis of probable cause to believe that the vehicle is evidence of a crime, then the officers in this case could not invoke this exception to the warrant requirement. In order to satisfy plain view requirements, the officer must not only inadvertently discover the object in plain view, but must also immediately recognize it as evidence of contraband (*see, e.g., State v. Murray,* 84 Wn.2d 527, 532–34, 527 P.2d 1303 (1974)), and the officers in this case did not immediately recognize the truck as contraband. *See Murray,* at 534–35. However, it is unnecessary to decide in this case whether satisfaction of the plain view exception is a necessary part of the warrant requirement exception for impoundment of an immobile vehicle as evidence of a crime. Even if the plain view requirements were not applicable, the police must, at the very least, have probable cause to believe that the vehicle is evidence of a crime. *See Houser,* at 149. The officers in this case did not satisfy this basic probable cause requirement, and thus this warrant requirement exception in inapplicable.

Finally, the vehicle was not subject to impoundment on grounds of the violations of traffic regulations. The legislature has not expressly authorized impoundment for the traffic offenses of cancelled license plates or lack of a front plate. The statutes proscribing the operation of an improperly licensed vehicle, RCW 46.16.010 and .240, are silent on the issue of impoundment, whereas other traffic statutes enacted in the same legislative session expressly authorize impoundment for other offenses. *See, e.g.,* RCW 46.32.060; RCW 46.16.135.

Thus, the impoundment in this case was not lawful, and the warrantless search of the VIN cannot be justified as an inventory search incident to a lawful impoundment. Moreover, even if one were to assume for the sake of argument that the impoundment was lawful, the search would still be improper because, as the trial court expressly found, the inventory in this case was a mere pretext for an investigative examination. The trial court expressly found that

> [a]lthough he [the officer] claims an intent to make an inventory search, I am satisfied that his main purpose was to obtain the VIN in order to run a check on whether the vehicle had been reported as stolen.

The record fully supports the trial court's finding. The testimony shows that the officer's real purpose in checking the VIN was to follow up on his and his captain's suspicions that the truck was stolen. Since the inventory was a mere pretext for an investigative examination, the warrantless search of the VIN cannot be justified under the inventory exception. *See Opperman,* at 376.

The search also cannot be justified under any of the other potentially applicable exceptions to the warrant requirement. The search cannot be considered incident to an arrest, because the respondent was not in the truck when arrested and had already been removed from the area when the search of the truck took place. *See United States v. Day,* 455 F.2d 454 (3d Cir. 1972); 2 W. LaFave, at § 7.1. The exigent circumstances exception does not apply because the automobile was lawfully parked and immobile.

*See, e.g., United States v. Young,* 489 F.2d 914 (6th Cir. 1974).

Since the warrantless search in this case was not justified by any of the exceptions to the warrant requirement, it was unreasonable and in violation of the federal and state constitutions. The trial court's order suppressing the evidence obtained through the search accordingly is affirmed.

ROSELLINI, BRACHTENBACH, and HICKS, JJ., concur.

UTTER, C.J. (concurring)—Our prior cases indicate that we will rely on the provisions of our state constitution, rather than their counterparts in the federal constitution, only to provide additional protection to citizens of this state. *See, e.g., State v. Hehman,* 90 Wn.2d 45, 578 P.2d 527 (1978); *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975); *Carter v. University of Wash.,* 85 Wn.2d 391, 536 P.2d 618 (1975). Because the evidence in this case is suppressible by reason of the Fourth Amendment, the majority unnecessarily applies Washington Const. art. 1, § 7.

The Fourth Amendment bars the police, once the booking search and seizure is completed, from invading a police property box without probable cause.[8] *People v. Smith,* 103

---

[8]Some courts have concluded otherwise. *See, e.g., United States v. Jenkins,* 496 F.2d 57 (2d Cir.), *cert. denied,* 420 U.S. 925, 43 L. Ed. 2d 394, 95 S. Ct. 1119 (1975); *United States v. Smith,* 340 F. Supp. 1023 (D. Conn. 1972). However, in many of those cases there was probable cause for the search and, more importantly, the seized items were on their face evidence of a crime. *See, e.g., United States v. Jenkins, supra; United States v. Smith, supra.* This is important, for the rationale of those cases is that since the police already saw the items, a second look did not create any greater intrusion into the suspect's privacy. But that rationale fails when, as in this case, the seizure from the box requires additional searching and further intrusions into the suspect's privacy before the evidentiary value of the seized item is determined. *See Smith,* at 1027.

Furthermore, dicta in *United States v. Edwards,* 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234 (1974), indicate that probable cause remains a condition precedent for postbooking searches of an arrestee's personal effects. In *Edwards,* the United States Supreme Court upheld a warrantless search and seizure of the clothes worn by an incarcerated suspect. It, however, cautioned:

> Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of

Cal. App. 3d 840, 163 Cal. Rptr. 322 (1980); *State v. Harrington,* 284 N.W.2d 244 (Iowa 1979); *People v. Trudeau,* 385 Mich. 276, 187 N.W.2d 890 (1971). Although arrestees have no privacy interest which can prevent a booking seizure of their personal effects, they do have a residual privacy interest in not having those belongings randomly and continuously searched during the entire period of incarceration. *People v. Smith,* 163 Cal. Rptr. at 325; *Farrie v. State,* 255 Ind. 681, 266 N.E.2d 212 (1971) (dissent).

The United States Supreme Court has consistently recognized the distinction between one's privacy interest in not having goods seized and in not having them searched, once seized. *See, e.g., Arkansas v. Sanders,* 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979). *United States v. Chadwick,* 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977). We, too, have recently acknowledged that distinction. In *State v. Houser,* 95 Wn.2d 143, 622 P.2d 1218 (1980), we held that the legal seizure of a toiletry bag does not automatically allow for a search of its contents.

Respondent's Fourth Amendment rights as to his effects in the property box did not vanish simply because they were handled by the police. *People v. Smith, supra; Farrie v. State, supra* (dissent). A citizen does not permanently lose his or her expectation of privacy in an area or goods simply because at some prior time it was legally exposed to the authorities. *See Michigan v. Tyler,* 436 U.S. 499, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978) (even though firemen have

---

police conduct "must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry v. Ohio,* 392 U. S. 1, 20 [20 L. Ed. 2d 889, 88 S. Ct. 1868] (1968). But the Court of Appeals here conceded that probable cause existed for the search and seizure of respondent's clothing, and respondent complains only that a warrant should have been secured.

*Edwards,* at 808 n.9. More specifically, the court stated:

*When it became apparent* that the articles of clothing were evidence of the crime for which Edwards was being held, the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered.

(Italics mine.) *Edwards,* at 806.

been legally within a house, their subsequent entries may require a warrant); *United States v. Hoffman,* 607 F.2d 280 (9th Cir. 1979).

Nor does the fact that respondent has no protected privacy interest in the key, *see United States v. Salvucci,* 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980), mean that he completely lacks standing to challenge the manner in which it was seized and used. *Salvucci* stated that if the respondents in that case could prove that they had a legitimate expectation of privacy in the areas in which the stolen goods were seized, then the evidence derived from the seizure of those goods would be suppressible. *Salvucci,* 448 U.S. at 95, 65 L. Ed. 2d at 630. The property box is one such area in which arrestees do have a protected privacy interest, *People v. Smith, supra,* and thus its contents cannot be removed without probable cause.[9] *See People v. Smith, supra; United States v. Edwards,* 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234 (1974); *cf. Reeves v. State,* 599 P.2d 727 (Alaska 1979) (relying on Alaska's constitution).

Besides protecting a legitimate expectation of privacy, imposing the probable cause requirement on property box searches has several salutary effects. To permit a detailed postbooking search through the arrestee's effects to see if he or she can be linked with some other offense would bestow upon the police an undeserved windfall. 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.3, at 320 (1978). It would also provide the police with a temptation to make subterfuge arrests. As

---

[9]The seizure of the key from respondent's property box cannot be justified by the rationale which allowed the police initially to remove the key from respondent. There are two justifications for permitting booking searches to be conducted without probable cause or a warrant. *See Reeves v. State,* 599 P.2d 727, 735 (Alaska 1979). The first is the institutional interest in prohibiting the introduction of weapons, illegal drugs, and other contraband into the jail environment. The second is the protection of the arrestee's property and the jail administration from claims that such property was lost or damaged while under its control. Neither of these justifications is served by a police intrusion into a properly inventoried property box. *See Reeves v. State, supra; State v. Kaluna,* 55 Haw. 361, 520 P.2d 51 (1974).

stated by the dissenting judge in *Farrie v. State, supra* at 687:

> I cannot accept an interpretation of the Fourth Amendment which would permit the police to search an arrestee, let us say arrested and in the process of being incarcerated for a minor traffic offense, and seize the contents of his pockets, briefcase and car for safekeeping purposes, and then to use these items in a general investigation for evidence of criminal conduct unrelated to the offense for which the person was arrested.

Finally, delayed searches without probable cause may constitute a denial of equal protection, as such a search can occur only as to defendants who do not have the financial means to obtain their release on bail. *Cf. Brenneman v. Madigan,* 343 F. Supp. 128 (N.D. Cal. 1972); *Mackell v. Palermo,* 59 Misc. 2d 760, 300 N.Y.S.2d 459 (1969).

This case is particularly appropriate for application of the rule, for all of the above elements are present. The police were able to seize the VIN evidence because respondent was incarcerated on an unrelated charge. Their removal of the key permitted them to conduct an exploratory search for the VIN upon the mere hunch that the vehicle was stolen and under the pretext of impoundment. Also, the removal of the key did not further the justification for permitting them initially to take it from respondent. If anything, their actions increased the likelihood that the key would be lost.

When the rule is applied to the present case, it appears that respondent's Fourth Amendment rights were violated. The police lacked probable cause to believe that the key was evidence of a crime. Therefore, the search of respondent's property box to obtain the key violated the Fourth Amendment. As a consequence of that violation, the VIN evidence should have been suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

HOROWITZ, J. (dissenting)—I must dissent. As the majority acknowledges, after the United States Supreme Court's

recent decision in *United States v. Salvucci,* 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980), the defendant does not have automatic standing to complain under the federal constitution of the search of a vehicle that he possessed knowing it to be stolen. *Salvucci* struck down the automatic standing rule that allowed a defendant to assert the Fourth Amendment rights of the true owner when the defendant was charged with possession of an item allegedly illegally searched or seized. *Salvucci's* holding should end the inquiry into the violation of Fourth Amendment rights alleged by the defendant Simpson in this case. For the reasons stated below, I cannot agree with the majority's unwarranted extension of our state constitutional provisions to preclude use of evidence arising from the police search against the defendant.

Article 1, section 7 of the Washington Constitution affords defendants protection identical to that of the federal Fourth Amendment. In the past, this court has always interpreted the federal and state search and seizure requirements identically. For instance, only 3 years ago in *State v. Smith,* 88 Wn.2d 127, 133, 559 P.2d 970 (1977), we stated:

> It is apparent that the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution are comparable and are to be given comparable constitutional interpretation and effect. Accordingly, in this opinion, reference will be made only to the Fourth Amendment.

*State v. Michaels,* 60 Wn.2d 638, 374 P.2d 989 (1962), in which this court first acknowledged the doctrine of automatic standing, relies solely on the *federal* constitutional analysis of *Jones v. United States,* 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725, 78 A.L.R.2d 233 (1960). There can be no question that the original justification and support for the automatic standing rule in this state was in its original promulgation by the United States Supreme Court as a matter of federal Fourth Amendment law.

In this case, for the first time, however, the majority suggests that differences between the federal Fourth Amendment and article 1, section 7 of the Washington Constitution compel a break from federal analysis.[10] The majority first recites the language of the respective constitutional sections, noting that the state constitutional framers must have intended a provision that "varied" from the existing federal Fourth Amendment because they chose different language. The majority does not explain why this state provision was subjected to interpretation identical to that given the Fourth Amendment during the first 91 years of its existence in our state constitution. Instead, the majority moves on to explain its "continuing policy basis" for automatic standing. As will be demonstrated below, this justification is analytically faulty and has nothing to do with any actual differences between the Fourth Amendment and Const. art. 1, § 7.

The majority states that it retains the automatic standing rule because the self–incrimination dilemma that originally formed part of the justification for the doctrine in *Jones* still remains. I cannot agree. In *Jones,* the United States Supreme Court adopted automatic standing in part because at that time, the defendant's testimony at the suppression hearing that he was in possession could be used as *substantive evidence* to prove the crime of possession at trial. The defendant could not be forced to incriminate himself, to offer evidence of the crime with which he was charged, in order to assert Fourth Amendment protection, and so the automatic standing doctrine was developed. In *Simmons v. United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), however, this self–incrimination

---

[10]*State v. Hehman,* 90 Wn.2d 45, 578 P.2d 527 (1978), which the majority cites as precedent for broader interpretation of our state constitution, does not rely on article 1, section 7 for its analysis and conclusion. *Hehman* merely states that "[d]ecisions of the United States Supreme Court . . . do not limit the right of state courts to accord to defendants greater rights", *Hehman, supra* at 49, and on that basis held that "a custodial arrest *is not proper* for a minor traffic violation." (Italics mine.) *Hehman, supra* at 50.

dilemma was eliminated. The defendant's admission at the suppression hearing that he had possession can no longer be used for the substantive purpose of establishing an element of the crime. This justification for the automatic standing rule, relied on by the majority, thus no longer exists.

The peripheral question of whether or not the defendant's admission can be used to *impeach* his testimony at trial is irrelevant to the reasoning undertaken in *Jones* that was eliminated by *Simmons*. The impeachment issue has no place in the decision to extend or abandon the automatic standing rule. As noted by the United States Supreme Court in *Salvucci*:

> Principally, respondents assert that the prosecutor may still be permitted to use the defendant's testimony to impeach him at trial. This Court has not decided whether *Simmons* precludes the use of a defendant's testimony at a suppression hearing to impeach his testimony at trial. But the issue presented here is quite different from the one of whether "use immunity" extends only through the Government's case–in–chief, or beyond that to the direct and cross–examination of defendant in the event he chooses to take the stand. That issue need not be and is not resolved here, for it is an issue which more aptly relates to the proper breadth of the *Simmons* privilege, *and not to the need for retaining automatic standing.*

(Footnotes omitted. Italics mine.) *United States v. Salvucci, supra* at 93–94. The automatic standing doctrine was never intended as a "license to lie" for the defendant; it was not developed to allow the defendant to perjure himself without sanction or consequence. *Jones* contains no discussion of the impeachment problem, as the majority in this case itself acknowledges:

> The principle was established to ensure in addition that a defendant claiming possession in order to acquire standing in the suppression hearing would not have this evidence used against him at trial *on the issue of possession.*

(Italics mine.) Majority opinion, at 175–76. The challenge to the veracity of the defendant as a witness is a procedural

matter which is irrelevant to the establishment of his substantive Fourth Amendment rights under the automatic standing doctrine.

The majority attempts to rely on analysis which has never formed a justification for the doctrine as a matter of federal law under *Jones* or state law under *Michaels* in order to uphold the rule of automatic standing after its federal rejection in *Salvucci*. Its belated attempt to include the possibility of impeachment as a reason for the doctrine is unpersuasive. Not only is it analytically faulty, but the attempt rests on mere speculation that the defendant Simpson would testify at his suppression hearing and at his trial, and further that his testimony would be contradictory.

I am not suggesting that our state constitution should never be given an interpretation different from that afforded the federal constitution. But I must strenuously object to differing analysis which appears to be based solely on the state court's unhappiness with the result reached by the United States Supreme Court:

> Even respected state courts occasionally have exercised their right to independent interpretation in a result–oriented way that undermines confidence in the judiciary and aggravates the uncertainties inherent in constitutional litigation. Because of this preoccupation with results, neither side has confronted adequately the problem of *how* independent interpretation should be employed. Advocates of independent interpretation, for example, simply insist on the state courts' undeniable right to interpret their own constitutions without interference from the Supreme Court. As a result, the opinions that purportedly interpret the state constitution often give scant attention to the provisions themselves or why those provisions require a result different from that reached by the United States Supreme Court.

(Footnotes omitted.) Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution*, 29 Stan. L. Rev. 297, 300 (1977). If we are to interpret our state constitution in a manner inconsistent with the United

States Supreme Court's interpretation of the federal constitution, we must do so on the basis of principles, not results. An examination of relevant criteria[11] will demonstrate why independent establishment of the automatic standing rule under our state constitution in this case is inappropriate.

First, the differences between the federal and state constitutions must be considered, with the emphasis being on independent interpretations *mandated by the language* of the state provision. The majority's error in relying on impeachment as justification for the automatic standing rule is compounded by the fact that the basis for its decision to break from this court's adherence with the United States Supreme Court's establishment of the parameters of constitutional protections against unreasonable searches and seizures is wholly unconnected with any actual differences in the language of the Fourth Amendment and Const. art. 1, § 7. Nothing in our state constitution suggests that concern over the "dilemma of self–incrimination," that the majority now perceives in the possibility of impeachment, is better expressed or more overtly important in our state constitution than in the concomitant federal provisions. In the past, this court has gone beyond the United States Supreme Court's constitutional interpretation only when the provisions of our constitution itself suggest that the additional protection of individual rights was contemplated. *See, e.g., Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975) (construing amendment to state constitution explicitly concerning sex discrimination). The language of Const. art. 1, § 7 does not in itself suggest the justification for the automatic standing rule relied on by the majority in this case.

---

[11]These four criteria are set forth after an analysis of California cases considering independent interpretation of the California constitution in Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution,* 29 Stan. L. Rev. 297, 318–19 (1977).

Second, we should look for state precedents which justify a result differing from the United States Supreme Court's. In this case, *State v. Michaels, supra,* arguably provides independent justification for the automatic standing rule. But *Michaels* itself relies solely on *Jones,* a federal case that was expressly overruled by *Salvucci.* The precedential value of *Michaels* thus must be lessened. *Michaels* reflects concerns that were largely alleviated in the later case of *Simmons v. United States, supra.* We must consider *Michaels'* continuing importance in light of the growth and change in related areas of constitutional doctrine.

Third, the existence of unique local conditions might prompt the state court to independently interpret its state constitution. There is no suggestion in this case that any such peculiarities of this state compel us to interpret our constitution differently from the Fourth Amendment. Indeed, the fact that this case deals with the exclusionary rule, which has as its purpose influencing police conduct, operates in favor of uniformity:

> The very purpose of the exclusionary rule, to deter unlawful police searches . . . requires that there be certainty in the ground rules of search and seizure. The more courts feel free to adopt ground rules unpersuaded by contrary decisions of other courts, the greater the likelihood there is of uncertainty in those ground rules.

*People v. Norman,* 14 Cal. 3d 929, 941, 538 P.2d 237, 246, 123 Cal. Rptr. 109 (1975) (Clark, J., dissenting).

Finally, we must consider the position on this issue taken by the United States Supreme Court. The Supreme Court has definitively and persuasively spoken on this issue only weeks ago in the case of *United States v. Salvucci,* 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980). Nothing distinguishes *Salvucci* factually from the case before us here. The majority's decision to embrace independent state grounds to obtain a result so recently rejected by the United States Supreme Court is unfortunate, for no compelling justification for the split with federal precedent has been or can be given. This is the type of decision making

that has quite justifiably "resulted in charges that state courts are evading Supreme Court doctrine and engaging in unprincipled, result–oriented use of their state constitutions." Note, *Principled Interpretation, supra* at 297.

The majority has created a dangerous precedent. It has opened the door to independent interpretation of article 1, section 7 of our state constitution without providing any guidelines for the use of this new tool of constitutional analysis. It has made the task of the lower courts in this state more difficult by providing them no method of predicting when this court may place a different gloss on an area of constitutional law that is already difficult for the legal profession, much less the police that must abide by our rules of conduct, to understand or follow. The benefits the majority may hope to achieve through adoption of this sort of constitutional analysis cannot possibly be worth the uncertainty and confusion its actions must cause.

I would reject the defendant's claim that he has automatic standing to challenge the police' actions in this case. Although I also have strong reason to object to the majority's holdings that police examination of the VIN and use of the car key was unlawful, I will not further consider these issues in view of my conclusion that the defendant has failed to show any right to raise these questions.[12] I therefore dissent on the basis that the automatic standing rule

---

[12]I would note, however, that the concurring opinion's position that the seizure of the truck's key from the police property box violated the Fourth Amendment is contrary to the holdings of most courts that considered an arrestee's expectation of privacy in a police property box and in the VIN of his vehicle. Viewing of the VIN through any reasonable means is not a search subject to Fourth Amendment probable cause requirements; there can be no expectation of privacy in the vehicle identification number. *See United States v. Ware,* 457 F.2d 828, 829 (7th Cir. 1972); *United States v. Powers,* 439 F.2d 373, 375 (4th Cir. 1971); *United States v. Polk,* 433 F.2d 644, 647 (5th Cir. 1970); *Cotton v. United States,* 371 F.2d 385 (9th Cir. 1967). In addition, the vast majority of courts hold that review of the defendant's personal effects after arrest and booking does not violate the Fourth Amendment. *See, e.g., United States v. Edwards,* 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234 (1974); *United States v. Lacey,* 530 F.2d 821 (8th Cir. 1976); *United States v. Jenkins,* 496 F.2d 57 (2d Cir. 1974).

has no place in our law after the United States Supreme Court's decision in *United States v. Salvucci, supra.*

DOLLIVER, J., and COCHRAN, J. Pro Tem., concur with HOROWITZ, J.